[No. 12036.   Department One.   June 24, 1914.]

ALBERT CHANDLER *et al.*, *Appellants*, v. THE CITY OF
SEATTLE *et al.*, *Respondents*.[1]

MUNICIPAL CORPORATIONS—BONDS—INDEBTEDNESS—LIMITATIONS—
"LIGHT" PLANT.   Bonds to be issued by a city for enlarging its mu-
nicipal "lighting and power" plant and system and furnishing elec-
tricity for light, power, and heat, are to be classified as "light bonds,"
within the limitation of Const., art. 8, § 6, authorizing any city to
become indebted to the extent of a second five per centum for sup-
plying the city with water, "artificial light" and sewers, and not as
"light and power" bonds, where from the beginning the city pur-
sued that policy and its electric light plant was used primarily for
lighting the streets and furnishing lights to the inhabitants, its
hydro-electric plant could be operated twenty-four hours a day at
practically the same expense as for shorter hours, the steam plant
was to be auxiliary, so as to have power available for lighting in
cases of emergency, and, by utilizing the surplus energy for power
and heat, the cost for lights was materially reduced.

SAME—GRANT OF POWER—AUTHORITY OF CITY.   A grant of power
to provide for lighting a city authorizes the erection and mainte-
nance of a plant for lighting the streets, and also, in connection
therewith, supplying electric light to the inhabitants of the city in
their private homes.

SAME—BONDS—UNRELATED OBJECTS.   In such case, the auxiliary
steam power plant and the enlargement of the hydro-electric plant
did not combine unrelated objects.

Appeal from a judgment of the superior court for King
county, Albertson, J., entered April 23, 1914, dismissing an
action to enjoin the issuance of bonds, tried to the court. Af-
firmed.

*Van Nuys & Hunter*, for appellants.

*James E. Bradford* and *Howard A. Hanson*, for respond-
ents.

GOSE, J.—This is a bill in equity by taxpayers to enjoin
the issuance and sale of certain bonds.   There was a judg-

[1]Reported in 141 Pac. 331.

ment for the defendants, which the plaintiffs have brought here for review.

The facts are these: In November, 1910, the citizens of Seattle, by more than a three-fifths vote, authorized the city to issue $1,400,000 of general bonds for improving and extending the existing municipal lighting plant, by the construction of a masonry dam on Cedar river, to replace the wooden dam theretofore constructed. One million dollars of these bonds have been issued and sold. In March, 1913, the citizens by a like vote authorized the city to issue $425,000 additional general bonds, "for enlarging and extending the municipal lighting and power plant and system . . . by the acquisition, by purchase or condemnation, of lands for a site, the construction of buildings thereon . . . for a steam power plant, for furnishing electricity for lighting, heating, fuel and power purposes, and for furnishing steam for heating purposes." The validity of the remaining $400,-000 bonds authorized at the first election and the $425,000 authorized at the last election, is attacked by the appellants. They contend, (1) that these bonds fall within, and are in excess of, the first five per cent debt limit as fixed by § 6, art. 8, of the constitution; (2) that the steam plant proposition contains unrelated objects; and (3) that it is ambiguous.

The article of the constitution referred to provides:

"That any city or town, with such assent, may be allowed to become indebted to a larger amount, but not exceeding five per centum additional for supplying such city or town with *water, artificial light, and sewers,* when the works supplying such water, light, and sewers shall be owned and controlled by the municipality."

The bonds were authorized in harmony with the provisions of the public utilities act, Laws 1909, page 580 (Rem. & Bal. Code, § 8005 *et seq.;* P. C. 77 § 1073).

The real question is, May the bonds be classified as light bonds? If so, they fall within the second five per cent limit of the constitution. The respondents contend, and the court

held, that they should be so classified. The appellants strenuously insist that they are, in fact and law, *light and power* bonds, and hence that they fall within the first debt limit of the constitution, and that if so classified the constitutional limit will be exceeded.

The city has from the beginning pursued the policy of charging such bonds to the second class. It has issued bonds and expended more than $3,000,000 for generating and transmitting electric current from Cedar river falls to and through the city, primarily for lighting the streets of the city and furnishing lights to its inhabitants in their homes. It first constructed a wooden dam at the Cedar river falls, but finding that inadequate, additional bonds to the extent of $1,400,000 were authorized for the construction of a masonry dam. In 1913, about twelve and one-half per cent of the entire revenue from the system was derived from the sale of current for power purposes, representing in quantity between one-fourth and one-fifth of the entire current. The city now lights one-third of its streets—about 879 miles, and furnishes lights to one-half of its inhabitants—about 150,-000 people. The current rate for lighting has been reduced from twenty cents per kilowatt hour in 1902, to six cents per kilowatt hour at the present time. Mr. R. H. Thompson, formerly city engineer of the city, after detailing the purpose of the city from the beginning, gave the following testimony:

"Q. Now, having the statutes all cleared away and the field clear, you prepared the ordinance creating the city light and power system? A. Yes, sir. Q. You declared that for what purpose? A. It is a light and power ordinance and it was prepared simply to define what must happen when you distribute electric energy. It may be light or heat or power, but it is electric energy. Q. Was it ever contemplated that the plant should be purely a power plant? A. Never. Q. Was it ever contemplated that the city should go into the power business, purely as such, for manufacturing and other purposes. A. Only in connection with light. Q. Only in

connection with light? A. Yes. Q. And what was the primary and dominating factor of the plant and system? A. To put a plant in the field, which by careful management would reduce the cost of light both to the city as a municipality and to the inhabitants of the city to a much less rate than was then being paid, and, if possible, to a rate equal to that charged for gas, and yet supplying a more cleanly method of illumination. Q. Now, has it been used after its construction for its primary purpose, and is it now being used for its primary purpose as a light plant? A. It is. Its whole purpose is for supplying light, but to make the price of that light the best price to the people who pay the cost of construction, the by-products are sold whether it is heat or power. Q. And there is a large amount of surplus energy to be disposed of as a by-product? A. During a great many hours a day there is. The light load runs up to its maximum at different hours of the year, but has an average of eight o'clock in the evening and it holds for three-quarters of an hour at the same point and then goes down to midnight, except household lights, it is almost nothing."

The evidence is that a hydro-electric plant may be operated twenty-four hours a day at practically the same expense as for shorter hours. All that is required in the operation of the plant is to permit the water to flow through the pipes and penstock onto the turbines. The steam plant will when constructed be auxiliary to the hydro-electric plant on Cedar river which is situated about forty miles from the city. The plan is to carry steam constantly, so as to have power available for lighting the city in cases of emergency. The city will use the surplus steam for power and heat. This surplus the witnesses term a by-product. By utilizing the surplus energy, the rate for lights is materially reduced. Whether the plant is operated for power or light, the expense will be the same, for, as the superintendent of the plant said: "It will be ready to connect with the light service of the city twenty-four hours in the day and 365 days in the year." The words "light, heat and power purposes" in the proposition first submitted, and the words "lighting, heating, fuel and power" in the last submission, are not controlling. They

must be read in connection with the main purpose stated in the submission, viz., "enlarging the municipal light plant," and in the light of the evidence. The city has shown in detail how it has expended the $3,000,000 in creating, enlarging, and extending its lighting system. These expenditures are for such items as dam, pipe lines, generating station, transmission line, city sub-station, and city distributing system. The first bond issue for this purpose was in 1902. The plan then adopted has been consistently adhered to, and the policy of the city has been, and is, to extend the lighting system as rapidly as its funds will permit to furnish the city and its inhabitants with electric lights as cheaply as possible, and to this end it has disposed of its surplus energy for power. The testimony, however, makes it clear that the principal and dominant object of the city has been, and is, to generate and transmit electric energy for lighting purposes.

An analogy may be found in eminent domain cases. In *Tacoma v. Nisqually Power Co.*, 57 Wash. 420, 107 Pac. 199, it was held that the city, in condemning land and water for the purpose of generating electric current for public uses, might anticipate future needs, and that a private use of the excess current, or of the current when not needed for public use, would not defeat the right to condemn for public uses. We there said:

"It is manifest that, in its use of power, the city must provide for the maximum power that will be required on the shortest day of the year. This required use would be its peak load, and would be the minimum horse power to be generated by its contemplated plant, or purchased under its present contracts. This peak load would gradually lessen until the longest day of the year, when it would be much less than its peak requirement; yet inasmuch as there is no known way whereby the city could store and save its power when not in use, it must provide, on the longest day of the year and at the time of least requirement, the same amount of power it must use on the shortest day of the year and at the time of greatest requirement. Neither will it require power

for lights until the evening of the day; yet it must have as much power at high noon as on the darkest night. If, in the meantime, it permits a small mechanic to run his lathe or sharpen his tools, such a use being so insignificant and so small as compared with the necessities that must be supplied, no court would hold that such use was such a private use as to prevent the city from maintaining these proceedings. A private use incidentally included will not defeat the right to condemn for public use so long as the public use is maintained."

In that case, the incidental use was smaller than in the case at bar, but the difference is one of degree, not of principle. Where there is a commingling of two objects to the extent that both are principal objects, a different rule applies. It is a question of *bona fide* intention, to be gathered from all the facts and circumstances in the particular case. Conservation and not waste should be the guiding rule. Whether the use of current for power and heating is an incidental use is a relative question. Obviously in a small town of slow growth the ratio of power to light would be less than in a rapidly growing city, because the ratio of surplus energy would be less. The rule announced in the Tacoma case was followed in *State ex rel. Lyle Light, Power & Water Co. v. Superior Court*, 70 Wash. 486, 127 Pac. 104; and *State ex rel. Weyerhaeuser Timber Co. v. Superior Court*, 71 Wash. 84, 127 Pac. 591.

The same view has been taken by textwriters and courts in other jurisdictions. Dillon, Municipal Corporations (5th ed.), § 1300; *Pikes Peak Power Co. v. City of Colorado Springs*, 105 Fed. 1; *Crouch v. City of McKinney*, 47 Tex. Civ. App. 54; *People ex rel. Los Angeles v. Los Angeles Independent Gas Co.*, 150 Cal. 557, 89 Pac. 108; *Bates v. Bassett*, 60 Vt. 530, 15 Atl. 200, 1 L. R. A. 166. In the *Crouch* case, the city was operating under a statute which gave it power to provide for lighting the streets. In considering the right of the city to use the surplus power of the plant for private uses, the court said:

"The capacity of the electric plant is much greater than necessary for the lighting of the streets and the excess or surplus is used by the city in supplying lights to individuals for their private use. When the city has a surplus of power after discharging its duty to the public, there seems to be no question of its authority to sell the excess to private citizens. . . . Under these conditions, rather than to have let the surplus power of the plant remain idle, it was better to sell such surplus of the electricity that was produced, for private use."

In *Bates v. Bassett*, the rule is thus declared:

"The town has no right as a primary purpose to erect buildings to rent, but if in erection of its hall for its proper municipal uses, it conceives that it will lighten its burdens to rent part of its building whereby an income is gained, no sound reason is suggested why it may not do so. The true distinction drawn in the authorities is this: If the primary object of a public expenditure is to subserve a public municipal purpose the expenditure is legal, notwithstanding it also involves as an incident an expense which standing alone would not be lawful. But if the primary object is not to subserve a public municipal purpose but to promote some private end, the expenditure is illegal, even though it may incidentally serve some public purpose. This is the test where good faith is exercised in making the expenditures. If a public purpose is set up as a mere pretext to conceal a private purpose, of course the expenditure is illegal and fraudulent."

A grant of power to provide for lighting the city authorizes the erection and maintenance of an electric plant for lighting the streets, and also supplying, in connection therewith, electric light for the inhabitants of the city in their private homes. *Jacksonville Elec. Light Co. v. Jacksonville,* 36 Fla. 229, 18 South. 677, 51 Am. St. 24, 30 L. R. A. 540. It has also been held, and we think correctly, that furnishing current for lights for the people in their private homes is a public service. *Mitchell v. City of Negaunee,* 113 Mich. 359, 71 N. W. 646, 67 Am. St. 468, 38 L. R. A. 157.

The appellants next contend that the steam power plant proposition combines several unrelated objects. We have al-

ready sufficiently analyzed this question. It suffices to say in addition that the evidence shows a purpose to have one efficient lighting system ready at all times to serve the public. *Blaine v. Hamilton*, 64 Wash. 353, 116 Pac. 1076, 35 L. R. A. (N. S.) 577; *Tulloch v. Seattle*, 69 Wash. 178, 124 Pac. 481.

Finally, it is contended that the steam plant proposition is ambiguous in that it does not disclose whether the plant is to be physically connected with, or independent of, the existing light plant. It shows on its face that it is to be an extension of the existing plant.

The judgment is affirmed.

CROW, C. J., ELLIS, MAIN, and CHADWICK, JJ., concur.