[No. 14296.  *En Banc.*  August 6, 1917.]

THE STATE OF WASHINGTON, *on the Relation of N. W. Huggins et al., Respondents,* v. ROBERT BRIDGES *et al., Appellants.*[1]

MUNICIPAL CORPORATIONS—PORT DISTRICTS — POWERS — OPERATING RAILWAYS—STATUTES—RAIL AND WATER TRANSFER AND TERMINAL FACILITIES.  Rem. Code, §§ 8165-1 and 8165-4, creating port districts as municipal corporations, and authorizing them to construct, acquire, maintain and operate, sea walls, wharves, docks, ferries, and locks "and other harbor improvements, rail and water transfer and terminal facilities" does not include a belt railway line to be operated by the port as a common carrier; since the power is not expressly granted, or fairly implied or incidental or essential to the powers granted, which from the tenor of the whole act, indicate the quoted words were intended to apply simply to means for the transshipment of commodities between water carriers and land carriers.

Appeal from a judgment of the superior court for King county, Jurey, J., entered July 9, 1917, in favor of the

[1]Reported in 166 Pac. 780.

plaintiffs, upon overruling demurrers to the complaints, in an action for an injunction. Affirmed.

*C. J. France,* for appellants.

*Carkeek & McDonald, F. M. Dudley, F. V. Brown,* and *Bogle, Graves, Merritt & Bogle,* for respondents.

HOLCOMB, J. — On November 3, 1915, the Seattle Port Commission adopted a resolution which provided for the construction and operation of a belt line railway to be known as Unit No. 14, which was submitted to the voters of the Seattle port district and ratified by them on December 4, 1915. At the same time thât the above mentioned resolution was submitted, a further resolution providing for bond issues with which to secure money to build Unit No. 14, which had also been passed by the commissioners of the port district, was submitted to the voters of the district, and at the same election at which the resolution to build the belt line railway was ratified, the proposition to bond was rejected. On March 7, 1917, there was again referred to the voters of the district the question of the issuance of bonds for the belt railway line, which again failed to carry. On May 23, 1917, the port commission, by resolution, provided for the creation of a belt line railway fund to be made up of various revenues, for the purpose of building the belt line railway. On June 30, 1917, the port commission, by resolution, provided for the building of the line. This action was then brought by respondents to enjoin the construction of the proposed belt line railway, and later an intervening complaint was filed by J. W. Clise. Demurrers were filed to each of the complaints, which were overruled. The appellants declined to plead further, and judgment was rendered in accordance with the prayer of the complaint and the intervening complaint.

In 1914, 1915, and 1917, certain ordinances were enacted by the city of Seattle, granting to the port commission the right to construct a belt line railway in the city. These ordinances were all accepted by the port commission. (Ordinances Nos. 33,253, 35,432, 37,442).

The complaints allege that the port commission has no authority to build any belt railway line, has no authority to create a belt railway line fund, and has no authority to accept the ordinances which it has accepted from the city council of Seattle; and the complaint in intervention avers there is no need for any such belt railway line, by reason of the fact that the city council of Seattle, on July 2, 1917, passed an ordinance granting franchises to other railroads in the city for the construction of a belt railway line, so that there will be no necessity for the port commission to build such a railway.

It was admitted by appellants at the trial below that the franchises granted by the city to the port commission are for the purpose of authorizing the construction of railway tracks by the commission as a common carrier, with power to fix, charge and receive rates for switching, transferring, and carrying freight to and from various industrial plants, warehouses, piers, docks, and terminals within the port district. It is also admitted that the franchises granted to the port commission are not only for the purpose of enabling the port commission to connect up its own units by a railway, but are intended to permit the port commission, as a common carrier, to run an independent switching belt railway line of its own.

Respondents maintain that the port commission is without power to construct or operate railways as a common carrier. This proposition is controverted by appellants, and that is the only question for solution in this case.

The port commission, under the statute creating it, is expressly declared to be a municipal corporation of the state of Washington. Laws 1911, p. 414, § 3; Laws 1913, p. 204, § 2 (Rem. Code, § 8165-3).

The question of the power granted such creatures of the statute must be examined critically, carefully and strictly, and not with a disposition to strain the grant to find the power.

"It is a well settled rule of construction that a delegation of powers will not be presumed in favor of a municipal corporation unless they be such as are necessary to its corporate existence, but that the same must be clearly conferred by express statutory enactment." *Tacoma Gas & Elec. Light Co. v. Tacoma*, 14 Wash. 288, 44 Pac. 655.

"It is a general and undisputed proposition of law that a *municipal corporation possesses and can exercise the following powers, and no others:* First, those granted in *express* words; second, those *necessarily or fairly implied* in or *incident* to the powers expressly granted; third, those *essential* to the declared objects and purposes of the corporation,— not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation, and the power is denied." 1 Dillon, Municipal Corporations (4th ed.), § 89.

See, also, 1 McQuillin, Municipal Corporations, § 353. The principle to be applied, therefore, is that a doubtful power is a power denied.

The question to be determined then is, in exact terms: Do the legislative enactments in relation to the proposed project, in express terms or by clear implication beyond a reasonable doubt, grant to the port districts the powers to construct railways and operate the same as a common carrier and to assume and perform the' obligations required by the Seattle ordinances granting these franchises; or are such powers indispensable to the declared objects and purposes of the district?

Chapter 92, Laws 1911, page 412, in the title to the act declared itself:

"An act authorizing the establishment of port districts; providing for the acquirement, construction, maintenance, operation, development and regulation of a system of harbor improvements and rail and water transfer and terminal facilities within such districts, and providing the method of payment therefor."

Section 1 provides:

"Port districts for the acquirement, construction, maintenance, operations, development and regulation of a system

of harbor improvements and rail and water transfer and terminal facilities within such districts, are hereby authorized to be established in the various counties of this state, as in this act provided." Rem. Code, § 8165-1.

Appellants assert that the title to the above act contains two main thoughts: (1) The owning, maintenance and operation of a system of harbor improvements; (2) the owning, maintenance and operation of rail and water transfer and terminal facilities. Counsel for appellants very ably argue their contentions and present a very resourceful and interesting brief in support thereof. Statements of several writers and experts, as to port terminals and municipal planning with regard to what are necessary and what are facilitative of the efficiency of port terminals, have been quoted at large in the briefs. These statements of such writers and experts, while doubtless true, do not assist us in determining the question of the municipal power. That, as said before, must be determined from the legislative intent alone.

The only provisions in the act suggestive of railways, or suggestive that the legislature had rail transportation in mind at all, is the phrase "rail and water transfer and terminal facilities," a phrase occurring three times in the act—in the title, in § 1, and in § 4, where, among other powers, the port districts are authorized "to lay out, construct, condemn, purchase, acquire, add to, maintain, conduct and operate any and all systems of seawalls, jetties, wharves, docks, ferries, canals, locks, tidal basins and other harbor improvements, rail and water transfer and terminal facilities within such port district" (Rem. Code, § 8165-4). In each provision the language is the same—"rail and water transfer and terminal facilities." We look in vain for any grant of power by the legislature to the port commission to operate a railway or to carry on a transportation business or act as a common carrier, except the operation of ferries, which is expressly granted, and that limited system of carriage or transportation designated by the word "transfer," which signifies to the ordi-

nary mind, and therefore to the court, the idea of transship-
ment from rail carrier to water carrier and vice versa. The
projected line is certainly a railway, not merely a transfer
switch, and designed to serve numerous industrial plants,
docks, piers and terminals.

We look in vain throughout the act, and various amenda-
tory acts passed subsequently, for any authority conferred
upon the port commission to fix, charge and receive rates for
railway carriage or for any other transportation than ferry
transportation. It is given the express power, by the amend-
ment of 1913, to fix absolutely and without right of appeal
or review the rates of wharfage, dockage, warehousing and
port and terminal charges upon all improvements owned and
operated directly by the port itself, and ferry charges of
ferries operated by itself; and to fix, subject to state regula-
tion, rates of wharfage, dockage, warehousing and all neces-
sary port and wharf charges upon all docks, wharves, ware-
houses, quays, or piers owned by said port district but oper-
ated under lease from it. Laws 1913, p. 210, § 4 (Rem.
Code, § 8165-4).

Railway switching or transportation rates are not named.
From this it would seem obvious that the legislature did not
intend that the port commission should enter upon the busi-
ness of constructing, operating, and maintaining railways as
common carrier lines of transportation. Nor do we think that
the power granted is capable of the separation in construing
it asserted by appellants. Manifestly, it seems to us, the
entire language of the title to the act creating the port dis-
tricts, and all of §§ 1 and 3 granting power thereto, contain
but one thought, and that is that such municipal corporations
should have power to acquire, construct, maintain, operate,
develop, and regulate a system of harbor improvements, with
such rail and water transfer and terminal facilities within
such port district harbor improvements as may be necessary
for the operation thereof. The powers granted are inter-
dependent and not separate, except as to ferries. The sepa-

ration of the powers granted into, (1) the owning, mainte-
nance and operation of a system of harbor improvements, and
(2) the owning, maintenance and operation of rail and water
transfer and terminal facilities, seems to us to do violence to
the plain intendments of the language and to grant a power
by inference, viz., the power of operating railways not ex-
pressly granted by the legislation and clearly not to be
implied.

We are asked by appellants to define what is meant by the
words "rail and water transfer and terminal facilities.". It
might be answered that it is sufficient to determine what
powers are granted this municipal corporation by the clear
intendment of the act or by necessary inference, and that no-
where is it granted the power to construct, operate and main-
tain railway lines, either terminal, belt, or otherwise, and to
act as such a common carrier. But we conceive that the
language referred to simply means such adjuncts and appur-
tenances as are necessary or convenient for the transshipment
of commodities between land carriers and water carriers.
Such facilities may include a spur track or switch to a dock,
pier, or warehouse, and they may include the connecting track
between two docks or piers or warehouses of the port com-
mission, for its convenience. If we construe the language as
contended for by appellants, instead of reading rail *and* water
transfer and terminal facilities, it should be read rail *or* water
transfer, etc. When the legislature has used precise words
and used words which subsequent portions of the act and
amendments thereto imply were the exact words meant to be
used by the law-making power, it is not the business of the
court to substitute words, even such a small word as "or"
for "and." Black, Interpretation of Laws (2d ed.), p. 231.

We are convinced, therefore, that the appellants have not
been granted the power proposed to be exercised by them.
The judgment is affirmed.

ELLIS, C. J., MOUNT, MAIN, MORRIS, FULLERTON, CHAD-
WICK, and PARKER, JJ., concur.