[No. 14907.  Department One.  January 6, 1919.]

THE STATE OF WASHINGTON, *on the Relation of Homer M. Hill, Respondent,* v. PORT OF SEATTLE *et al., Commissioners of said Port District, Appellants.*[1]

MUNICIPAL CORPORATIONS (22, 23) — GOVERNMENTAL POWERS — AUTHORITY TO MANUFACTURE ICE.  Laws of 1917, p. 498, § 1, empowering port districts to maintain and operate "warehouses, storehouses, elevators, grain-bins, cold storage plants, terminal icing plants . . ." authorizes the manufacture and sale of ice only as connected with the general scheme of its public business as a warehouseman for preserving shipments cared for or shipped at its docks and terminals; and does not grant power to build a plant and engage in manufacture largely in excess of its needs and to sell to others engaged in retailing ice.

SAME (22).  Such power cannot be sustained on the theory that it may build in reasonable anticipation of future needs, where it built deliberately in excess of any demand that might be made within any reasonable future time, especially in view of the fact that ice plants can be built in units and added to as necessary.

SAME (22).  Ice is not a by-product of a cold storage plant, notwithstanding the ice manufacturing machinery may be run by the same power as the refrigerating plant.

TOLMAN, J., dissents.

Appeal from a judgment of the superior court for King county, Frater, J., entered January 10, 1918, upon findings in favor of the plaintiff, in an action for an injunction, tried to the court.  Affirmed.

*C. J. France,* for appellants.

*Robert A. Devers* and *Piles & Halverstadt,* for respondent.

CHADWICK, J.—In *State ex rel. Hill v. Bridges,* 87 Wash. 260, 151 Pac. 490, we held that the port district might build and operate an ice manufacturing and cold storage plant as an incident to its business of

[1]Reported in 177 Pac. 671; 180 Pac. 137.

warehousing. In the beginning, the power of the port district to manufacture and sell ice in the market as a commodity was raised. To forestall the question, the port district passed a resolution in which it disclaimed any such intention, saying, *inter alia,*

"It is not the purpose or intention of the commission to sell this ice, but to furnish it to fishermen at the fish storage warehouse and to charge a rate of so much per pound for the use of the warehouse storage, which charge will include the ice furnished."

The intent of the resolution being to clearly proclaim that the commission would use its product to pack, recondition, preserve and re-ice for shipment such fish as might be brought to its docks.

The case was carried on to final decree, this declaration being a deciding, if not a controlling factor, in the final decision of the court. At the following session of the legislature, the commissioners prepared and caused to be enacted an amendment to the act defining its powers. As abridged for the purposes of argument by counsel for appellant, the amendment is as follows:

"All Port Districts . . . are hereby authorized . . . to lay out, construct, condemn, purchase, acquire, add to, maintain, conduct and operate, any and all systems of . . . wharves, docks, . . . warehouses, storehouses, elevators, grain-bins, cold storage plants, terminal icing plants, bunkers, . . . together with modern appliances for the economic handling, storing, and transporting of freight and handling of passenger traffic, and other harbor improvements, rail and water transfer, and terminal facilities within such port district." Laws of 1917, p. 498, ch. 125, § 1.

Under the license of this amendment, as construed by counsel for the port district, the commissioners have—

(a) Manufactured and sold ice to railroad and ex-

press companies for the purpose of icing refrigerator cars to transport perishable commodities out of the city of Seattle, although the shipments originate at other docks and warehouses.

(b) To railroad companies and express companies to carry into the interior and into other states for the purpose of refrigerating cars to carry perishable commodities into the city of Seattle, and without reference to the dock, warehouse or wharf at which the shipments are to be discharged.

(c) To steamboat companies for the purpose of icing and preserving perishable commodities carried by vessels departing from the city of Seattle.

(d) Cracked ice to fishing boats bound for the fishing grounds and banks, to preserve fish until they are brought into port and placed in cold storage or reconditioned.

(e) To fishermen and to those engaged in packing fish brought by fishing vessels to the city of Seattle and handled and stored at the port district's docks at the east waterway.

(f) To fish packers and brokers, and other persons engaged in handling other perishable commodities, on various docks and piers within the city of Seattle.

(g) To others engaged in selling ice at retail in the city of Seattle.

As an incident to its business of cold storage or refrigeration, the commissioners put in an ice making plant. We say incident, for ice can be manufactured with the same power and the same crew, and, possibly, with the same liquids. This, as we take it from a general view of the record, may be of either greater or less capacity, depending upon the number of cans or plates the manufacturer sees fit to install.

The commission installed a plant having a capacity of 15,000 tons per year, which is largely in excess of

the present needs of the port district. The commission built up to the capacity of the machinery of the cold storage plant without reference to its needs as outlined by its resolution aforementioned; that is, to store, to recondition and repack for reshipment fresh fish brought to its own warehouses.

Relator brought this suit to enjoin the commissioners, and a temporary restraining order holding appellants generally to a limit of power consistent with the disclamatory resolution was issued. When the case came on for hearing on its merits, the court held that the temporary order should be made permanent, with some exceptions not necessary to mention here.

It cannot be denied that the appellant port commission is manufacturing far beyond its needs as a warehouseman, and doing a general commercial business in the manufacture and the sale of ice in the particulars mentioned.

Counsel for appellant ground their appeal on the amendment of 1917. In the words "terminal icing plants" they find justification for the doing of all of the things complained of.

Witnesses were sworn to testify on either side as to the meaning and comprehension of the term. They ran true to the form of expert witnesses and differed widely in their conclusions. Those offered by the appellant were generally of the opinion that the words mean that the appellant might do anything in the way of a business in ice that would promote the business of the port of Seattle, not the business of appellant corporation the "Port of Seattle" alone, but of everyone engaged in business in the city of Seattle and the county of King, and it is so earnestly contended here.

Whatever meaning may be given to the abstract phrase "terminal icing plant," we are sure that the meaning given it by appellant cannot be sustained.

For our purposes it must remain in its setting and sustain its true relation in context. The amendment pertains strictly to the business of the appellant, it may "maintain, conduct and operate warehouses, storehouses, elevators, grain-bins, cold storage plants, *terminal icing plants,* . . . together with modern appliances, etc., . . . and terminal facilities within such port district," as a grant of power to engage in private business away from, or in no way connected with, the general scheme outlined in the act creating the port district and the amendment of 1917.

The business of the port in receiving, icing, reconditioning, and packing fish for reshipment at its wharves, docks and warehouses is in aid of its public function, although done in a proprietary capacity. When it goes beyond the bound of its public engagement to take care of such business as does not naturally come to its terminals it ceases to be a public functionary. It is then engaged in a strictly private business, and for that there is no warrant in the law, either by express enactment or by implication, for the rule of construction is that any doubt as to the power of a municipal corporation must be resolved against the municipality—only such powers as are expressly granted, or such as are necessarily incident to its granted power, will be sustained, for the policy of the law has always been to limit, rather than to extend, the proprietary functions of a municipal corporation. *State ex rel. Hill v. Bridges,* 87 Wash. 260, 151 Pac. 490; *State ex rel. Huggins v. Bridges,* 97 Wash. 553, 166 Pac. 780.

That it was not the intention of the legislature to invest the port commissioners with a general power to do business away from its docks and terminals and wheresoever it pleased in the city of Seattle or in

King county, and which might ultimately ripen into a monopoly and work to the destruction of private business or the business of other quasi public corporations, was held in *State ex rel. Huggins v. Bridges, supra,* where we had the phrase "rail and water transfer and terminal facilities" to construe. The port district maintained that it had a general, or at least an implied power, to carry on a transportation business as a common carrier. Answering its argument, we said:

"We are asked by appellants to define what is meant by the words 'rail and water transfer and terminal facilities.' It might be answered that it is sufficient to determine what powers are granted this municipal corporation by the clear intendment of the act or by necessary inference, and that nowhere is it granted the power to construct, operate and maintain railway lines, either terminal, belt, or otherwise, and to act as such a common carrier. But we conceive that the language referred to simply means such adjuncts and appurtenances as are necessary or convenient for the transshipment of commodities between land carriers and water carriers."

And in accord with the rule of construction thus laid down, we held that the port district has only such powers as are "indispensable to the declared objects and purposes of the district."

Counsel's argument rests upon an assumption, oft repeated and as many times assumed, that the port district is the city of Seattle and King county, and whatever is done by it within these limits and which may affect the inhabitants of these political subdivisions is within its power to maintain "terminal icing plants." Geographically and as a unit for bonding or taxation to meet money demands, the port district is King county, but as a business corporation, the activities of the port district are limited to its own

field of endeavor as outlined by the act creating it and by its necessary implications. It has no concern with business other than that which comes to it, or that may be brought to it by the offering of better service and facilities, and if it undertakes to serve other "industrial plants, docks, piers and terminals" it may be challenged, as was done in the *Huggins* case.

Many cases are cited to sustain the theory that a municipal corporation may dispose of its surplus product, whatever the character of the product may be; electricity, water, and even a surplus of room in public buildings. The latest expression of this court upon this doctrine will be found in *Chandler v. Seattle*, 80 Wash. 154, 141 Pac. 331. But to pursue this question would be idle, for although now well established in our own cases, and generally throughout the country, it is not controlling of the case at bar. The decree of the court saves to appellant the right to dispose of all ice manufactured in excess of the reasonable requirements of its own business.

It is also argued that, if a city can build in anticipation of future needs, or build to sustain a peak load at certain hours or at certain seasons, and having thus a surplus, it may dispose of it in the market, and since appellant has built a plant capable of manufacturing a commodity in excess of its present needs, it should be permitted to dispose of it likewise. But the rule relied on is born of the facts in the particular case. The facts are not born of, neither can they demand as of right that they be adopted by, the rule.

The power to sell a surplus product by a municipal corporation is allowed only where the municipality has built in reasonable anticipation of its future needs, or, as in the *Chandler* case, dammed or curbed the

whole of a stream to meet proper engineering conditions, or has a variant surplus in excess of its needs from day to day, but created with reasonable expectations of using it for its own purposes. The fault here, and we understand it to be frankly admitted, is that the appellant was not bound to build the whole to attain the part that it would need in the prosecution of its own affairs. It deliberately built a plant knowing that it had a capacity far beyond its present demands, and beyond any demand that might be anticipated within any reasonable future time. It built to manufacture at will, with the expectation of selling ice as a commodity, and not as an incident to its business or its present or reasonably prospective engagements with its patrons.

It was not bound to build as it did, for it was understood by the commissioners, as it is of all men, that an ice plant can be built in units and added to as necessity required.

Finally, it is said that ice is a by-product of the cold storage business, and that the power to sell should follow to the end that waste should not follow. But ice is not a by-product of a cold storage plant. If, in the refrigeration of a warehouse, ice is formed and machinery could be installed to save it, we might well say that it is a by-product, but where ice manufacturing machinery is installed, although it is to be run by the same power as the refrigerating plant, it is no more a by-product than a steam heating system, a light system, or any other contrivance that may be operated with the same power would be.

We conclude, therefore, that appellant's powers are limited by the terms of the act creating it and its necessary implications, and that it has no power to manufacture and sell ice to meet any market other than the

reasonable demands of its own business, which is to care for, preserve and pack for reshipment such perishable products as may be received, cared for, or shipped out of its terminals, and that in all other things it should be restrained; providing, however, that it may, without violating its restraint, dispose of any excess of ice manufactured in a *bona fide* attempt to manufacture only so much ice as may be reasonably required by it for the freezing, conditioning, reconditioning, packing, icing, re-icing, and preserving products handled at its cold storage and terminal icing plants, docks, and warehouses.

The judgment entered by Judge Frater is affirmed with the modifications called for by this opinion, the legal effect of the same being to revive the temporary restraining order and to eliminate the modifications made therein by the judgment appealed from.

MAIN, C. J., MACKINTOSH, and MITCHELL, JJ., concur.

TOLMAN, J. (dissenting)—I cannot agree to the conclusions reached by the majority. The law, chap. 125, Laws of 1917, p. 498, § 1, contemplates that the port commission shall use its own judgment as to the needs of its district, present and prospective, and shall lay its plans and construct its plants according to what, in its judgment, the business of its port may require immediately or in the not distant future, and so long as the commission acts in good faith, its judgment should be supreme, and the courts should not undertake to interfere therewith. I find no evidence in the case showing, or tending to show, that the port commission acted otherwise than in good faith in building its ice manufacturing plant in anticipation of its future needs. And having constructed its plant in good faith in such anticipation of future needs, it should, in the interest of efficiency and economy, be permitted

to operate its ice plant to capacity and keep its equipment busy, in order to reduce the cost of manufacturing to the lowest point possible, and should be permitted to dispose of its surplus on the market, notwithstanding possible competition with private concerns engaged in the ice business, free from any interference by the courts.

Under the authority of *Chandler v. Seattle,* 80 Wash. 154, 141 Pac. 331; Dillon, Municipal Corporations, § 1300; *Gottlieb-Knabe Co. v. Macklin,* 109 Md. 429, 71 Atl. 949, 31 L. R. A. (N. S.) 580, and the cases there cited, the judgment of the trial court should be reversed, and the cause dismissed for want of equity.