[No. 36535. En Banc. July 2, 1964.]

ROBERT HOSEA et al., *Appellants,* v. THE CITY OF SEATTLE et al., *Respondents.*\*

\*Reported in 393 P. (2d) 967.

Benson & Atwell, for appellants.

A. C. Van Soelen, John A. Logan, and Robert Ward Freedman, for respondent City of Seattle.

FINLEY, J.—This is a lawsuit against the city of Seattle by Robert Hosea, his wife, and their three children (plaintiffs-respondents) to recover compensation for personal injuries and property damage sustained in an automobile collision. The collision occurred on August 23, 1958, when John Ussery drove an automobile negligently across the center line of a highway and into the path of the oncoming Hosea family vehicle. At the time, John Ussery was technically a prisoner or jail inmate in the legal custody and subject to the legal control of the city of Seattle.

Ussery had been transferred from the city jail and assigned as a trusty to the Wallingford precinct police station. He was absent from the precinct police station without express permission when the accident occurred, and was driving an automobile, privately owned by a third party. He was not, however, an *escapee*. His absence from the precinct police station and his driving of the automobile occurred or arose, apparently, as concomitants of certain practices and circumstances involving the assignment, use or employment of trusties at neighborhood police stations in the city of Seattle.

The record indicates that for many years the city of Seattle has kept two inmates from the city jail assigned to the Wallingford precinct police station as trusties for the pur-

pose of servicing official police motor vehicles. The prisoners so assigned are normally those with short sentences involving minor offenses. As trusties at the Wallingford precinct station, the prisoners are not confined or kept under direct surveillance. They are quartered on the second floor of the station house, eat their meals at public expense in a privately-owned restaurant across the street, and, generally, are accorded free run in and about the station premises when not on duty.

In addition to working on police motor vehicles, the trusties, as part and parcel of the "trusty" program, are permitted to earn small sums of money by washing privately owned vehicles, using the police station facilities. Further, they are allowed to perform odd jobs for the businessmen in the area, and also to perform other jobs which might take them away from the station on their own recognizance. While the facts are somewhat in dispute, the record strongly indicates that the prisoners could and did leave the station on personal matters, more or less at will, without the permission or knowledge of the police officials in charge, usually subject to no more than a minor rebuke upon return. There also is some indication that alcoholic beverages were consumed by the prisoners on several occasions, both on the precinct premises and in local taverns, and apparently without any serious official concern upon discovery.

On the afternoon of the day of the accident, the prisoner Ussery, who had but 3 days to serve on his *sentence for drunken driving,* left the precinct station for more engaging company and surroundings, thereupon, apparently, indulging some propensity for intoxicants. Subsequently, he obtained (under disputed circumstances) an automobile owned by the daughter of the owner of the restaurant where the Wallingford precinct trusties were fed. Ussery drove the automobile toward Bothell, purportedly to secure replacement parts to repair a defective tail or blinker light on the vehicle. The combination of circumstances proved very unfortunate for plaintiff Hosea and his family, as indicated above.

The plaintiffs alleged and sought to establish liability on the part of the city of Seattle. The case was tried to a jury, which returned a verdict for the plaintiffs and awarded substantial damages. The defendant city moved successfully for judgment notwithstanding the verdict, and the trial judge dismissed the action against the city with prejudice.

The grounds for the dismissal as stated by the court were: (1) That the confinement of prisoners and their employment to service police cars constituted a governmental function, and the city is protected from liability under the doctrine of governmental immunity from tort claims; and (2) that Ussery's negligence, driving under the influence of intoxicants, some miles distant from his place of detention, was not a reasonably foreseeable consequence of negligent failure to supervise and control the prisoner, and was not attributable to negligence in permitting him to leave the police precinct station.

We think that neither of the stated grounds is sufficient to set aside the conclusions reached by the jury. As to the question of governmental immunity, the first ground for dismissal mentioned above, it should be noted that the trial judge was required to rule on this matter prior to the decision in *Kelso v. Tacoma* (1964), 63 Wn. (2d) 913, 390 P. (2d) 2. Thus, his ruling was without knowledge of our recent abrogation of the doctrine of governmental immunity as an absolute or general bar against liability for harmful tortious conduct by a municipality.

However, even without this significant development in the tort law of Washington, the result should have been the same in the instant case. Diaphanous, but telling, distinctions were made before *Kelso v. Tacoma, supra,* as to whether certain municipal activities should be categorized as proprietary or governmental. Depending upon the characterization, tort liability did or did not attach. In such a context, it can be said that usually the care, custody and control of prisoners, *i.e.,* criminal offenders, are considered as clearly governmental in nature. The *quid pro quo,* profit or benefit is substantially a social one. In other words, the

custodial function is for the social advantage and protection of society rather than a pecuniary or financial benefit in dollars and cents to the public exchequer. In the instant case, clearly there were some very desirable societal advantages inherent in the program for trusties as formulated and operated by the Seattle Police Department at the Wallingford precinct station. *But this was not all.* City prisoners were not legally or otherwise obligated, and they did not have to wash and do repair and maintenance work as to police vehicles. In their doing so, the operations involved a financial return to the city treasury to the extent that the program eliminated the expense otherwise necessary to have the vehicles serviced, *e.g.,* privately, in gasoline stations or garages. In this sense we believe the trusty program was strongly proprietary in nature, negating a characterization of the program or operation as clearly governmental and entitling the city to immunity from tort liability. We find no merit in the trial court's first ground for dismissal.

■ We come now to a discussion of the trial court's second ground for dismissing the lawsuit with prejudice, namely, that Ussery's conduct-negligence (driving under the influence of intoxicants, crossing the white center line and colliding with plaintiffs' automobile) was not foreseeable in a legal sense, in terms of negligence and proximate causation on the part of the city of Seattle. Foreseeability, as a legal concept, is closely related to, overlaps, or may even be said to be a significant facet or element of both negligence and proximate cause, and should perhaps be considered in this context rather than being overemphasized by treatment as a separate and distinct legal or factual matter.

It is well established that the intervening acts of third persons, legally accountable or not in their individual capacities, do not necessarily break a chain of proximate causation which sets the limits or prescribes the standard for determining legal responsibility and/or liability. *Berglund v. Spokane Cy.* (1940), 4 Wn. (2d) 309, 103 P. (2d) 355. While foreseeability has been treated as a major

element in this determination, it is not the sole considera-
tion in attempting to set the limits of legal responsibility
in terms of cause in fact.

The principle of proximate causation is not self-
defining and absolute in meaning; nor is it self-executing
in relation to a lawsuit. In the hands of a jury or an appel-
late court the concept does help to organize thinking and
to direct intellectual evaluation and decision making. The
jury and the appellate court still must weigh and weight
factors, values, facts and circumstances presented in a
given case. If the record, evidentiary pattern, can be said
to reasonably support the jury's determination, this should
end the matter in terms of the review function of the
appellate court. We are not to substitute our choice of
values and judgment for that of the jury. *McLeod v. Grant
Cy. School Dist.* (1953), 42 Wn. (2d) 316, 255 P. (2d) 360.

A review of the facts in the instant case indicates
that reasonable men could differ on the question of proxi-
mate causation. The record clearly shows that the trusty
program has been an established one for many years, that
it is of benefit both to the city and to the individual pris-
oner, and that the washing of police cars and performing
of private outside jobs (obtaining small stipends for the
prisoner) inevitably entails some lessening of restraint
upon the prisoners so engaged. The element of foreseea-
bility in proximate cause is clearly satisfied by testimony
from which the jury could have found that the city knew,
or should have known, that private cars were being driven
on and off the premises by the prisoners. Furthermore, it
appears that the city reduced its restrictions upon a person
with a known propensity for attempting a dangerous mix-
ture of automobiles and alcohol. The indulgence of such
a proclivity was encouraged, in fact made probable, by the
manner in which the trusty program was allowed to oper-
ate by the city. We are unable to hold as a matter of law
that the evidence was insufficient to submit the question of
proximate cause, including its element of foreseeability, to
the jury for its determination.

The action of the trial court should be reversed, the verdict of the jury reinstated, and judgment entered for the plaintiffs accordingly against the city of Seattle. It is so ordered.

ROSELLINI, HUNTER, HAMILTON, and HALE, JJ., and DAWSON, J. Pro Tem., concur.

DONWORTH, J. (dissenting)—I am of the opinion that the trial court correctly granted respondent's motion for judgment n.o.v. in this case and therefore I dissent for the reasons stated below.

The trial court granted the motion for judgment n.o.v. on two grounds: (1) That in the confinement of prisoners who are incarcerated in the city jail while serving sentences imposed by the municipal court, the city was engaged in a governmental function and thus was free from tort liability; and (2) That, even if the city is liable for its negligence in connection therewith, the accident involved in this case was not a foreseeable event. Therefore, this dissent, like the majority opinion, covers two areas—(1) governmental v. proprietary function, and (2) foreseeability.

The collision occurred on August 23, 1958, which was prior to the 1961 enactment of RCW 4.92.090. A majority of this court held in *Kelso v. Tacoma*, 63 Wn. (2d) 913, 390 P. (2d) 2 (1964), that from and after the effective date of that statute the legislature changed the policy of the state previously operative by removing from municipalities the immunity from tort liability, which they formerly enjoyed.[1] I think that we should, therefore, treat the question of tort liability arising in this case according to the rules of law as they existed prior to the 1961 act.

The first question, then, to be considered, is whether the

---

[1] Appellants argue that the 1961 act is applicable to this case, but, since the majority opinion does not find it necessary to discuss that contention, I shall not make further reference thereto. For the same reason, I make no reference to appellants' further contention that the city was maintaining a nuisance and hence that the doctrine of governmental immunity does not apply to this case. See *Kilbourn v. Seattle,* 43 Wn. (2d) 373, 261 P. (2d) 407 (1953).

keeping of prisoners by police officers is a governmental or proprietary function.

In order to understand the operation of the trusty program in the city of Seattle as applied to the activities of prisoner John Ussery, whose conduct is a vital factor in this case, we should have in mind the applicable legislative provisions.

First, reference should be made to applicable statutory provisions relating to the keeping of prisoners who are serving sentences imposed by the municipal court upon conviction of the violation of city ordinances.

RCW 35.22.280, in prescribing the powers of a city of the first class, states, in subdivision 18 thereof:

"(18) To erect and establish work houses and jails, and to control and regulate the same, and to provide for the working of prisoners confined therein;"

The city charter, in Art. 6, §§ 4 and 5, relating to the police department, provides:

"Sec. 4. CHIEF TO MANAGE POLICE DEPARTMENT: The chief of police shall manage the police department, and shall prescribe rules and regulations, consistent with law, for its government and control; . . .

"Sec. 5. First. PROCESS DIRECTED TO CHIEF OF POLICE; CHIEF TO MAINTAIN PEACE, KEEP CITY PRISON: The chief of police shall be the chief peace officer of the city, . . . The chief of police shall maintain the peace and quiet of the city. He shall be the keeper of the city prison. . . ."

Sections 12.08.020 and .040 of the Seattle Code provide:

"All prisoners during their term of imprisonment or commitment, after conviction and sentence by the Police Justice of the City of Seattle to a term of imprisonment in the city jail of said city, whether in default of payment of fine or otherwise, may be required on each day of said term, except Sundays, to perform eight (8) hours labor upon the streets, public buildings, lots, blocks, engine houses, sewers or public grounds of such city, or other property of the city or property of which the city has direct charge or control, or in clearing the crossings of streets in said city, and may be required to wear an ordinary ball and chain while performing such labor." 12.08.020.

"Prisoners performing labor, as provided for in the preceding sections, shall be in the care and custody of the Chief of Police of the City of Seattle, whose duty it shall be to see that such prisoners are guarded to prevent escape, and if necessary, he may shackle them." 12.08.040.

Second, we consider the facts shown by the record regarding John Ussery. He was arrested in July, 1958, on a charge of being drunk in public. It was then discovered that 3 years before this event he had been charged with driving a motor vehicle while drunk. For some reason, unexplained in the record, he had never been tried on that charge. He was then tried on both charges and was given a suspended sentence on the charge of being drunk in public and was fined $110 on the charge of driving while drunk. Being unable to pay the fine, he was to serve time at the rate of $3 credit per day. At the time of the accident involved in this case, he had 3 days left to serve.

According to the existing custom in the Seattle police department, one officer was assigned to the duty of selecting prisoners in the city jail for work detail and selecting trusties. Receiving a request for a prisoner to work at the Wallingford precinct police station to fill one of two positions, this officer, who had had 10 years' experience in this type of work, designated Ussery as one of the prisoners to work there.

Ussery's duties there were the servicing and the washing of police cars. No repairing of cars was involved other than trivial items, such as replacing light bulbs. While at Wallingford, the two prisoners were under no physical restraint. They slept in a room on the second floor of the station and ate their meals at a restaurant across the street. The lack of restraint in their activities is described in the majority opinion.

On the afternoon of August 23, 1958, Ussery borrowed an automobile from the daughter of the proprietor of the restaurant where the trusties ate their meals. His alleged purpose was to repair a defective rear blinker light. He drove to Bothell to obtain parts. Appellants alleged that he was intoxicated at the time of the accident when the

car he was driving crossed the center line and collided with their car. As a result, appellants sustained very severe personal injuries for which the jury awarded them substantial damages.

In their brief, appellants summarize their grounds of liability on the part of the city as follows:

"That the collision and resulting injuries and property damage suffered by appellants were proximately caused, in addition to the negligent driving of Ussery, by the negligence of the City of Seattle in assigning Ussery, as a trusty, to the Wallingford Precinct Police Station for the purpose of maintaining vehicles; in permitting Ussery to come and go from the station at will and without restriction; in permitting and encouraging Ussery, and other trusties to earn money by washing and maintaining private automobiles with the facilities of the city; in permitting Ussery and other trusties to stay away from the precinct premises for extensive periods of time to perform such work and odd jobs as they could obtain, including the operation and maintenance of automobiles other than those owned by the City; in permitting and encouraging Ussery to drive automobiles not owned by the city; in maintaining such inadequate supervision over Ussery that he was likely to and did consume alcoholic beverages while a trusty at said station and particularly since Ussery had a prior record with the City of Seattle of convictions for excessive drinking and driving violations, all of which was known to or should have been known to the City of Seattle."

I agree with the majority when it says that the keeping of prisoners is clearly a governmental function; but, I cannot follow its reasoning in holding that the city in this case was engaged in a proprietary activity because it was deriving benefit from having the prisoners wash and service police cars. I think the trusty program is an integral part of the city's keeping of prisoners, and the working of prisoners is treated as part of the regular city jail system. From 1894 until the passage of the 1961 law, this court consistently held that all cities have been accorded governmental immunity from tort liability in connection with the operations of their police, fire, park, and health departments. *Russell v. Tacoma*, 8 Wash. 156, 35 Pac. 605 (1894); *Hager-*

*man v. Seattle,* 189 Wash. 694, 66 P. (2d) 1152, 110 A.L.R. 1110 (1937); *Hotel Cecil Co. v. Seattle,* 104 Wash. 460, 177 Pac. 347 (1918), and *Lakoduk v. Cruger,* 47 Wn. (2d) 286, 287 P. (2d) 338 (1955).

Neither am I able to agree that the supposed saving of a dollar or two on washing each police car places the city in business in a proprietary capacity. In the first place, the city has no authority to use police department premises for operating a proprietary enterprise. Such activity would be ultra vires and the city would not be liable for the torts of its agents committed in connection therewith under the rule stated in *Woodward v. Seattle,* 140 Wash. 83, 248 Pac. 73 (1926), in which we held that passengers injured on a municipal bus could not recover from the city because at that time the city had no legal authority to engage in that type of business. In that case, we quoted with approval from *State ex rel. Hill v. Port of Seattle,* 104 Wash. 634, 177 Pac. 671, 180 Pac. 137 (1919):

" 'The rule of construction is that any doubt as to the power of a municipal corporation must be resolved against the municipality—only such powers as are expressly granted, or such as are necessarily incident to its granted power, will be sustained, for the policy of the law has always been to limit, rather than to extend, the proprietary functions of a municipal corporation.' "

There also exists serious doubt in my mind as to the correctness of the majority's result, even if it be conceded that the agents of the city were negligent in this case.

This court has said many times that to have actionable negligence in such a case, we must find (1) a duty of care, (2) a breach of that duty, and (3) that the injury complained of is a reasonably foreseeable consequence of the risk created by the breach of the duty. *Rose v. Nevitt,* 56 Wn. (2d) 882, 355 P. (2d) 776 (1960), and cases cited.

In the present case, the city's duty of care could arise in two separate ways:

First, § 12.08.040 of the Seattle City Code imposes a duty upon the chief of police to see that working prisoners are guarded to prevent escape. He is authorized by the ordi-

nance to keep them shackled by an ordinary ball and chain while they are working outside the jail. This duty, however, is not intended to protect the general public from the acts of prisoners while at large, but is to place upon the police department the responsibility of supervising the prisoners while they are at work. No duty was owed appellants by the above statute, and there is no breach of duty for which the city is liable.

A well reasoned case which is directly in point is *Williams v. State,* 308 N. Y. 548, 127 N. E. (2d) 545 (1955). There, the plaintiff, as executrix, sued the state of New York for the death of the decedent, who died from a brain hemorrhage caused by emotional stress brought on by fright occasioned by threats of a convict who had walked away from a minimum security prison farm as the result of negligence of officers of the state. The plaintiff recovered a substantial judgment against the state in the court of claims which had been affirmed by the appellate division.

On appeal to the court of appeals, that court concluded that it was error to find proximate cause on the part of the state. It was held that, although the state had been held liable for acts of escaped mental patients, in the *Williams* case the state had no reason to believe the prisoner would commit the alleged acts of violence, based upon his past record. Because of the similarity of the New York case with the one now before us, portions of the decision are quoted below. The court said:

" . . . At the prison farm, prisoners are supervised under conditions of 'minimum security'. This practice of relaxing security restrictions at prison farms is 'proper and approved' in this State, and eligibility for such work is determined by the principal keeper of the prison.

" . . .

" . . . As Judge Crane put it in *O'Neill v. City of Port Jervis* (253 N. Y. 423, 433), there can be no liability for a 'negligent' act unless there existed 'a reasonable likelihood of danger as a consequence of the act complained of'. It is this likelihood of danger, or, as Chief Judge Cardozo declared in the *Palsgraf* case (*supra,* at p. 344), this 'risk reasonably to be perceived', which defines the *duty* 'to be obeyed' in each situation.

"With the above construct before us, did the State, *qua* jailer, owe to Williams, as a private citizen, the particular duty of preventing the escapee here involved from committing the assault which frightened Williams to death? To begin with, it will be helpful to compare the duty to guard the public from escaped prisoners with that of protecting it from the inmates of mental hospitals.

"   .   .   .

"   .   .   . The risks to be perceived with the mentally ill who are irresponsible defines the State's duty to protect others from them.

"Kennedy, by contrast, was not a *psychiatric patient*; indeed, an examination by the prison psychiatrist in February, 1950, found no indication of psychosis—the worst that could be said of him in that report was that he was 'socially maladjusted'. Nor was Auburn Prison in any sense a mental institution or hospital. If the jailer owes a duty to the outside world with regard to the sane persons who have been placed in his custody for a variety of illegal activities, it is to assure the public that such criminals will remain in his care until, by the course of time or a proper legal determination, they have been declared free of their debts to society. *Restraint* and *punishment* must be distinguished here.   .   .   .

"   .   .   .

"Certainly Kennedy's violation of parole in August, 1950, for which he was returned to prison and then transferred to Auburn Prison, gave no indication of future violence—the violation being merely failure to report weekly to the parole officer. Nor can the violations of prison discipline for which Kennedy was punished while in Auburn Prison be said to have provided such foreseeability for, as even the Court of Claims has conceded, they were 'of minor nature'. All things considered, it can hardly be said that the State owed a duty to members of the public to protect them from the risk of exposure to such a man.

"Unlike a mental patient, Kennedy was being *punished*, and for that reason deprived of his liberty. Thus, if the State negligently permitted Kennedy's premature return to society, it breached only that *public* duty *to punish*, a duty owed to the members of the community collectively but importing no 'crushing burden' of liability to individuals for the breach thereof (see *Steitz v. City of Beacon*, 295 N. Y. 51, 54-55). If it was a wrong, it was not a wrong to Williams, for, as to him, the breach of duty or wrong did

not carry with it 'possibilities of danger' (*Palsgraf* case, 248 N. Y. 339, *supra*, p. 345); the assault or threatened force upon him was not 'The risk reasonably to be perceived' (*id.*, p. 344). As to Williams, the State's claimed carelessness was 'negligence in the air' or 'in the abstract' (*Palsgraf v. Long Island R.R. Co., supra*, at pp. 341, 345), and was not joined to his death by the element of foreseeability. His death therefore may not be included within the class of consequences of the State's negligence for which it must answer in damages (see *Paglia v. State of New York*, 278 App. Div. 281, affd. 303 N. Y. 821).

"Of course, to be liable, the State need not have been required to foresee the exact manner in which its negligence will result in injury, but merely that some injury will result therefrom (*Lowery v. Manhattan Ry. Co.*, 99 N. Y. 158, 162-163). Here, nothing in Kennedy's record, his psychiatric history or his prison experience, gave any indication that he was likely to wander from the prison and assault members of the public. It is of some note that the Court of Claims found no fault or negligence in the fact that a man with Kennedy's background was assigned to 'minimum security' farm work 'in accordance with the administrative rules of the prison', an assignment which is regarded by the prisoners as a 'privilege' accorded only those few [here, 25 out of 1,600] whose records merit the lowered security restrictions of the outside work gangs.

"As we said in *Flaherty v. State of New York* (296 N. Y. 342, at p. 346), where we reversed a holding that the State was liable for the attack of one reformatory inmate upon another, 'The law is clear; it is only in its application that difficulty is encountered. The State—just as any other party (Court of Claims Act, § 8; L. 1939, ch. 860)—is responsible, in the operation of its schools, hospitals and other institutions, only for hazards reasonably to be foreseen, only for risks reasonably to be perceived.' That rule cannot be reconciled with the judgment below.

"That Williams was frightened to death by Kennedy's willful acts may be conceded. This does not mean, however, that the State is liable for its alleged negligence in the absence of foreseeability, which 'defines the duty to be obeyed'. Without duty, there can be no breach of duty, and without breach of duty there can be no liability."

The court then concluded that the trial court's judgment for the plaintiff should be reversed and his action against the state dismissed.

In *Green v. State*, 91 So. (2d) 153, 155 (La. App. 1956), a 15-year-old inmate of the state industrial home escaped, because of a state employee's negligence, stole an automobile, and negligently injured the plaintiff. The trial court dismissed plaintiff's claim for damages and the decision was affirmed by the supreme court, which said:

"While the custodians of prisoners 'may be held liable for injuries done to a third person by a prisoner in the course of an escape,' 72 C.J.S., Verbo Prisons § 23, i, p. 896; they 'are not liable for injuries inflicted by an escaped prisoner, where the negligent or wrongful acts of such officials are not the proximate cause of the injuries,' 72 C.J.S., Verbo Prisons, § 12, p. 865; citing Moss v. Bowers, 216 N. C. 546, 5 S. E. 2d 826, 828, which held that the injury to the third person was not within the natural, probable, and foreseeable consequences of the alleged negligent acts which permitted the prisoner to escape, and that 'the injury complained of is too remote to be referred to the negligence of the defendant as the proximate cause.' See Annotation, 78 A.L.R. 471 at 476.

"An institution's duty to restrain a convicted criminal is not based upon the purpose of protecting the general public from all harms that the prisoner might inflict if he were allowed to escape. A convicted person may be as dangerous on the day of his legal release as he was on the first day that he was confined, although the institution may still be under a legal duty to detain or to release him. There is no more reason for the State to be civilly responsible for the convict's general misconduct during the period of his escape than for the same misconduct after a legal release, unless there is some further causal relationship than the release or escape to the injuries received. The breach of the State's duty to continue the prisoner's incarceration thus should not be complained of by those injured through the escapee's negligent operation of a car. For the breach of the duty to be a proximate cause of the injury for which recovery is sought, the injury received should be one for the prevention of which the duty exists."

Second, a duty would arise from the standard of care created from the particular facts and circumstances of the case. Included below are those facts which I feel would most likely give rise to the city's standard of ordinary care

in the keeping of trusties at the Wallingford precinct station.

As revealed by the record, the following are some of the facts which the city knew, or should have known, concerning trusties sent to the Wallingford station: Most of them have a drinking problem. When sober, they cause little or no trouble and require little supervision. While the city can require the prisoners to work, there are not enough jobs so that all the prisoners who are qualified and desire to be trusties can be placed on a work list. One police officer testified that, in his 13 years at the Wallingford precinct, he had known very few prisoners to walk off while being permitted the privileges of a trusty, and that none had ever driven a car on the public streets. Testimony given by various police officers in substance showed that the prisoners were given instructions on their duties while at the precinct. Among those instructions, the following are included: (1) They were told not to drink any alcohol while a trusty or they would be returned to the downtown jail; (2) that, when washing cars, they were forbidden to drive upon the city streets and were permitted only to move the vehicles on the city property, because many of them had had their licenses revoked; (3) that they were to eat at a designated restaurant across the street from the precinct station; and (4) that they were not to leave the area without permission. (Sometimes a trusty would be allowed visitation privileges where he could leave the precinct, *e.g.,* to go home, if nearby, for a change of clothes or a meal.)

Facts specifically relating to trusty Ussery, of which the city was aware, or should have been aware, according to the record, and which would have a bearing on the city's standard of care in supervision, are as follows: Ussery had been instructed not to drink or he would be taken to the downtown jail, and no officer that testified said he had any knowledge of Ussery's drinking while at the precinct. The chief clerk at the Wallingford precinct testified that Ussery at one time had wandered off during the day and was painting a private house. After discovery of this, and upon

Ussery's return, he was rebuked and forbidden any continuation of the practice. He was allowed to wash cars for private parties upon police property, but was instructed not to drive any car upon the public streets.

I am convinced that the city owed appellants no legal duty, arising out of the above-related facts of the case, to keep Ussery in confinement or under other physical restraint until the expiration of his jail term. *Williams v. State, supra*, p. 549. Further, I conclude that Ussery's borrowing of an automobile from the daughter of the restaurant proprietor, and his driving it in Bothell in a negligent manner, was, in light of the evidence in this case, unforeseeable by the city and its police officers. *Williams v. State, supra*, p. 550. Lastly, I am of the opinion that Ussery's intervening acts of negligence committed after he left the Wallingford station broke the chain of causation so that the acts of the city and its police officers (such as their failure to keep Ussery under continuous physical restraint until the expiration of his jail term) were not the proximate cause of appellants' injuries. See *Azcona v. Tibbs*, 12 Cal. Rptr. 232 (1961).

Nor is the city liable, under the law existing at the time of the collision, because the police chief failed to enforce a city ordinance requiring that city prisoners, while working, be kept under adequate guard. *Goggin v. Seattle*, 48 Wn. (2d) 894, 899, 297 P. (2d) 602 (1956), and cases cited. In that case, we quoted with approval from 4 Dillon, Municipal Corporations (5th ed.), § 1627, as follows:

" 'Unless there be a valid contract creating, or a statute declaring, the liability, a municipal corporation is not bound to secure a perfect execution of its by-laws, relating to its public powers, and it is not responsible civilly for neglect of duty on the part of its officers in respect to their enforcement, although such neglect results in injuries to private persons which would otherwise not have happened.' "

As previously stated, I can find no factual or legal basis for holding that the city was engaged in any proprietary function at the Wallingford station in connection with Ussery's activities there.

For these reasons, I would affirm the trial court's judgment n.o.v.

OTT, C. J., concurs with DONWORTH, J.

HILL, J. (dissenting)—I dissent. I am in accord with the reasoning of Judge Donworth's dissent as it relates to the nonliability of the city of Seattle on the basis of the proposition that in the supervising of prisoners serving sentences imposed by its municipal court, the city was engaged in a governmental function.

Assuming the law of this state to be what the majority declared it to be in *Kelso v. Tacoma* (1964), 63 Wn. (2d) 913, 390 P. (2d) 2, it is clear that the court's action in that case in abrogating the rule of municipal immunity from tort liability while engaged in the exercise of governmental functions, was based on Laws of 1961, chapter 136, § 1 (codified as RCW 4.92.090) and Laws of 1963, chapter 159, § 2. The collision which caused the plaintiffs' injuries occurred August 23, 1958, and the plaintiffs commenced their action in March of 1959. There is no indication that the legislation, so broadly construed in *Kelso v. Tacoma, supra,* was intended to be retroactive in its application. See *Hammack v. Monroe Street Lbr. Co.* (1959), 54 Wn. (2d) 224, 339 P. (2d) 684.

While I do not concur with Judge Donworth on the foreseeability issue, I would, however, affirm the trial court's dismissal of the action against the city of Seattle for the reasons given by Judge Donworth in that portion of his dissent dealing with the issue of governmental immunity.

September 17, 1964. Petition for rehearing denied.