BURKE CHRISTIE, *Respondent,* v. THE PORT OF OLYMPIA *et al.,*
*Appellants.*[1]

[1]Reported in 179 P. (2d) 294.

*Leo Teats* and *George F. Yantis,* for appellants.

*R. F. Dotsch, Ray Dumett,* and *Tom M. Alderson,* for respondent.

*Bassett & Geisness* and *Zabel, Poth & Paul, amici curiae.*

ROBINSON, J.—This appeal arises out of a controversy concerning longshoremen's wages. On the face of the pleadings, the action appears to be concerned with the claim of one man only. It is, however, a test suit, brought by a taxpayer, and similar claims of other workmen employed by the defendant port during that period may stand or fall as the result of the decision to be rendered herein. Furthermore, it is anticipated that the decision of certain of the legal questions raised in this case will, or at least may, determine similar wage claims of a great number of employees of the other public ports of the state. It is for that reason that the International Longshoremen's and Warehousemen's Union have intervened. Briefs have been filed on its part, and additional briefs by several *amici curiae* representing Washington locals of that organization. Two Seattle attorneys participated in the trial, one of whom, in stating their reasons for so doing, said:

"I may say to Your Honor that this case is an important one. It has been designed practically as a test case. Mr. Alderson and myself were requested by the Public Association of Ports to bring this about, and we are appearing with Mr. Dotsch to see that all the ultimate facts are presented to the Court and the Court will then determine in the light of the law whether this payment of retroactive pay was within the powers of the Port, . . . Necessarily, we will want a decision of the Supreme Court ultimately. The evidence will show the public ports of the state desire to make these payments if it can validly be done. *The question is one of power.*" (Italics ours.)

Plaintiff taxpayer prayed that the defendant port commissioners be permanently enjoined from carrying into effect the following resolution:

"BE IT RESOLVED by the Port Commission of the Port of Olympia as follows:

"That the Auditor of the Port of Olympia be, and he is hereby, authorized and directed to forthwith prepare, issue and deliver to F. W. Edgbert, a warrant of the Port of Olympia in favor of said F. W. Edgbert, in payment of retroactive additional compensation, retroactive overtime compensation and retroactive vacation pay for longshoremen's services rendered by him to the Port of Olympia from October 1, 1944, to November 8, 1945, inclusive, the amount of such retroactive additional compensation, overtime compensation and vacation pay to be computed by the Auditor on the basis set forth in the recent agreement entered into between the Waterfront Employers' Association of the Pacific Coast and the International Longshoremen's and Warehousemen's Union.

"Wendell McCrosky<br>
"Chairman of Port Commission<br>
"Port of Olympia.

"Attest: Martin Gottfeld
 "Secretary of Port Commission
 "Port of Olympia.

"Unanimously adopted by the Port Commission of the Port of Olympia in open session this 18th day of July, 1946, and signed by the Chairman and attested by the Secretary of the Port Commission in authentication of its passage on the same day.

"Wendell McCrosky<br>
"Chairman of the Port Commission<br>
"Port of Olympia."

The material portion of the decree entered by the trial court and from which this appeal is taken reads as follows:

"ORDERED, ADJUDGED and DECREED that the defendants, and each of them, be and they are hereby, permanently enjoined from further proceeding with or attempting to carry into effect, either directly or indirectly, resolution No. 422 of the Port of Olympia, adopted July 18, 1946, either in whole or in part."

The representatives of the workmen insist that their clients are entitled to the so-called retroactive pay as a matter of common honesty. The Port of Olympia takes that position, and, as we have seen, the representatives of the other public ports of the state recognize their moral obligations in the premises, but are apprehensive as to their power to discharge them. As was stated by one of respondent's attorneys at the beginning of the trial, the question raised in this case is one of power. To deal with it, we must first survey the factual background.

Although we may take judicial notice of certain relevant circumstances which are universally known, our factual sources are otherwise limited to such admissions as are made in the pleadings, and to a six-page transcript of stipulated facts, supplemented by some twenty pages of transcribed oral testimony given by Ernest C. Gribble, manager of the defendant port, and eleven pages of similar testimony given by Frank Andrews, a longshoreman by trade, now and for some years president of the local longshoremen's union, as well as a member of the executive board of the International, and by virtue of such membership a member of its negotiating committee. There is no substantial conflict between the evidence given by Gribble, the manager of the port, and Andrews, the president of the local union, and no witnesses were called to rebut their testimony.

As declared in the act providing for the creation of port districts (Laws of 1911, chapter 92, p. 412; Rem. Rev. Stat., § 9688 [P.P.C. § 777-1] *et seq.*), the purpose of the act was, and is, to provide suitable facilities for the transfer of goods from shore to ship, and from ship to shore. Such operations

necessitate the employment of longshoremen and steve-dores, a class of labor which not only requires men of strong physique, but, in the case of foremen especially, men of experience and skill. For many years, such workmen have been organized into local unions, tightly woven into the structure of their parent body and rigidly responsive to its leadership. As a result, the employers of such labor also organized. We quote from the stipulation of facts:

"The Waterfront Employers Association of the Pacific Coast is a non-profit corporation of the State of California, herein called the 'Association,' and its membership includes all employers engaged in stevedoring and handling of cargoes at terminals at Pacific Coast ports exclusive of public port authorities, such as defendant Port of Olympia and certain other employers not here material.

"The wages, hours and working conditions for longshore-men have been the subject of collective bargaining agree-ments between the Union and the Association since the award of the National Longshoremen's Board dated October 12, 1934. At ports in the State of Washington covered thereby it has been the policy and practice of the public port authorities, including defendant Port of Olympia, and the Union to apply the wages, hours and working conditions of said collective bargaining agreements to work performed by longshoremen for said public port authorities."

It is reasonable to suppose that such a development of policy and practice was inevitable. The public ports, of necessity, would have to follow the lead of their vastly more numerous competitors, organized, as they were, into a great association, including all other employers of long-shoremen on the Pacific coast. That the ports did so from 1934 on is agreed, and, even if it were not so agreed, the fact is established by the testimony of both Gribble and Andrews. The public ports, however, did not go so far as to enter into written contracts with the International. It appears that the defendant port and the public ports gener-ally were doubtful as to their right to enter into such con-tracts with a labor union. We quote a portion of the testimony of Port Manager Gribble:

"Q. What has been the basis of agreement, for want of a better word, between longshoremen and the Port of

Olympia as to hours, wages and working conditions? . . . A. Well, in the first place, we have to operate. *We have always known that supposedly it was illegal for us to enter into any formal written contract with the labor union,* but still we had to operate and it was necessary for us to obtain, as I say, the most experienced labor. It was obviously an operating expediency, and also a necessity, for us then in obtaining experienced labor to pay to that labor, at least as a minimum, the same rates of pay that that labor would receive from private operators who were members of the employers with whom the labor supply through their union had a contract, and so it was just taken for granted that we would pay those wages as a minimum at least." (Italics ours.)

At another point in giving his testimony, Mr. Gribble said that, at a meeting held by the public ports, the commissioners of several stated

" . . . that they had received an opinion from their attorney that it was illegal for public ports even to sit in a labor relations committee meeting,"

and that he reported this to the Port of Olympia commission. This, as we understand it, is the reason that negotiations with the longshoremen were assigned to him.

Mr. Andrews testified, in part, as follows:

"A. Starting back in the year 1934, I met with Mr. Gribble, then representing the Port, and dealing with the local labor relations committee. I was president of the local at that time, dealing with the question of what was to be the position of the Port of Olympia relative to hours, wages and working conditions for the Port of Olympia, being that *they were a public owned body and could not have a written contract with us,* and we so notified them if we didn't get some kind of a satisfactory verbal agreement with them that we *was* free to strike the Port and not furnish any men on ten minute's notice. At that time, prior to the '34 strike, it was agreed by the Port of Olympia that they would compute, or they would go along with any contract reached by the Waterfront Employers covering the longshore work that was done through the Port of Olympia." (Italics ours.)

Additional light is thrown upon the background of this

controversy by the following testimony given by Mr. Gribble:

"Q. Over how many years did you operate on that basis? A. I believe it must have been since the 1934 strike, at least, maybe previous to that. Q. And did you meet with the labor relations committee of the union from time to time? A. Yes. Q. About how frequently would you meet with them? A. Oh, sometimes once a month, sometimes several months would elapse; it all depended. Q. During the meetings with the Union's labor relations committee, did you in that committee—that is, while you were a member of the committee as a whole—did you ever have occasion to refer to the Waterfront Employers' contract? A. Oh, yes. In fact, we used to have to look at the book to find out just what the rules were. Q. The rules in relation to what? A. The rules in relation to working conditions. Q. Would it come up as to rates of pay? A. No, I wouldn't say it would come up as to rates of pay. It would come up as to the size of loads, the number of men, the working conditions, not rates of pay. Q. And did you ever have any arguments or discussions regarding penalty time for the working of cargo? A. I believe there were a few discussions that the men claimed penalty time and in making out our payroll we didn't catch it and we immediately paid them. Q. Would you adjust those discussions and controversies on the basis of the Waterfront Employers' contract? A. Yes. Q. In other words, except in minor instances that you heretofore mentioned, was the Waterfront Employers' Association contract the basis for agreement between the Port Authorities and the International Longshoremen's and Warehousemen's Union? A. It was the yardstick that we used, yes. Q. And did you first start operating that way in 1934? A. Well, it may have been previous to that. Maybe we started operating when we first opened up the Port, although it was not a dispatcher's proposition. I forget just what the dates were, twenty years ago. Q. At least from '34? A. Yes, at least from '34."

As a matter of fact, it appears that, although, during the period 1934-1944, the Port of Olympia never paid longshoremen less than the rate provided in the Waterfront Employers' contract, that rate was regarded as a minimum. It was "necessary," Mr. Gribble testified, for the Port of Olympia at times to pay an even higher rate than stipu-

lated for in the International-Waterfront Employers' contracts in order to secure experienced men.

"As Mr. Yantis stated in his talk a little while ago, we are also, here in Olympia, faced with certain local conditions, certain disadvantages under which we have to operate as compared with the larger ports, and in order to give proper service to the vessels and so forth, it is necessary for us to sometimes give a little better service on the docks than maybe the ships receive in other ports, and in order to do that we have to get, as I say, not only the most experienced men, but it is necessary for us, and we have in the past paid more wages than called for in the agreement between the union [association] and the longshoremen in order to obtain as many experienced men as possible in our dock operations, and that is the general form of agreement that we have acted on, a matter of expediency and necessity."

The wages which the Port of Olympia desires to pay, and the similar wages which, we are assured by counsel, the other public ports desire to pay, "if it can validly be done," are alleged to have been earned during the period from October 1, 1944, to November 8, 1945. There is evidence that, during that period, the demand for all classes of labor was at peak. This was particularly true as to longshoremen.

As everyone knows, at the beginning of that period, our armed forces had already established an airfield on Saipan and were steadily and rapidly acquiring the bases and staging grounds required for the projected invasion of the home islands of the Japanese Empire. It became imperatively necessary to transport across the Pacific an incredible amount of food, military supplies, and ammunition within a matter of months. The bulk of this freight was necessarily routed through the ports of the Pacific coast.

To handle its share of this traffic, in addition to lend-lease shipments to Russia, the Port of Olympia had to have a steady supply of longshoremen of skill and experience, and they were procurable only from the same labor pool as that from which the members of the Waterfront Employers' Association drew their longshoremen, for which pool the International was the collective-bargaining agent. If, as the

evidence amply establishes, it was necessary for the Port of Olympia to pay wages equal to those paid by the members of the association in order to get qualified longshoremen during the period from 1934 to 1944, we can well believe that it became imperatively necessary to do so in 1944 and 1945.

It appears that, sometime prior to October 1, 1944, the International union, then working under a written agreement with the Waterfront Employers' Association, formally notified the association that its members would not work after October 1st unless the association would, as of that date, increase the wage scale by the amounts set out in this notice. Negotiations were had, but the parties were unable to agree upon the percentage of increase. It was, however, of the greatest public concern that cargo should be kept moving, and it was agreed by and between the International union and the association that the men would remain on the job after October 1st, receiving currently the hourly rates they had been receiving, but ultimately, in addition thereto, such additional sums, if any, which the national war labor board, after a hearing of the dispute, might hold to be a fair and reasonable rate of pay for work done after October 1st.

It may be said, at this point, that the war labor board had hearings, both parties presenting their contentions at length, but the board did not announce its decision until some time thereafter. It held that a higher rate should have been paid for work done after October 1st, and it is stipulated in this action that the members of the Waterfront Employers' Association "are legally obligated to pay said retroactive adjustments and have either paid or are preparing to pay the same."

The Port of Olympia was not a party to the International-Waterfront Employers' agreement, but, as has heretofore been stated, for a period of ten years prior to 1944, it had paid its longshoremen the same rates as were provided for in the then current International-Waterfront Employers' contracts. The agreements to do so were made with the International by Port Manager Gribble from year to year for a

period of ten years. There is no testimony, however, to the effect that the commissioners ever gave the port manager explicit authority in the matter. Yet, we think they must have known and approved his acts in that regard, continuing, as they did, for so many years. To suppose that they did not, would be to attribute to them unimaginable ignorance and negligence.

It is established, by evidence, that Gribble, with full knowledge of the contract between the International and the Waterfront Employers' Association as to the undetermined scale of wages to be paid by the members of the association for work done after October 1, 1944, agreed that, if the members of the local union would continue to work for the Port of Olympia, the port would conform to the conditions of the International-Waterfront Employers' Association contract, as it had done during the preceding ten years.

The respondent contends that payments made by a port commission in accordance with such a contract would be a gift of public moneys, in violation of Art. VIII, § 7, of the state constitution, the material part of which reads as follows:

"§ 7. CREDIT NOT TO BE LOANED.—No county, city, town, or other municipal corporation shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association, company, or corporation, . . ."

It is further contended that, at all events, the making of the payments provided in the alleged contract would be a literal violation of Art. II, § 25, of the state constitution, which reads as follows:

"EXTRA COMPENSATION, PROHIBITED.—*The legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor after the services shall have been rendered* or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office." (Italics ours.)

We think there is no merit in these contentions. The payments contemplated are neither gifts nor "extra compensation." Assuming for the present that the contract was legally made, the payments represent compensation which

accrued in strict pursuance to a contract made before the work was done. It is true that the resolution providing for the payments is unhappily worded. It speaks of "retroactive compensation," but, plainly, it is merely deferred compensation that was provided for in the contract.

Retroactive payments and retroactive compensation, in the true sense, arise out of such situations as the following: Workmen say to their employer: Our wages are unfairly low and have been for many months. We will strike on June 1st unless you not only raise our wages twenty cents an hour from then on, but also pay us an additional ten cents for each hour we have worked since January 1st. Such contracts have been frequently made. A private employer can validly make such a contract with his workmen, but, if a municipal corporation should make such a contract, it would probably run afoul of one or both of the constitutional provisions above quoted. It would at least seem indisputable that the payment of the additional ten cents an hour for work done from January 1st to June 1st in the case supposed would be extra compensation after the service was rendered, but the payments claimed under the alleged contract (if there was such a contract) were earned day by day according to the terms thereof. Payments were merely deferred.

The case of *State ex rel. Eshelman v. Cheetham*, 21 Wash. 437, 58 Pac. 771, is readily distinguishable from the case at bar. It was held in that case that the employees of the Senate agreed to accept a fixed per diem for their services when they entered upon their duties. The additional compensation was claimed only through afterthought, that is, after the work was done. Here, the hourly rate was not fixed. On the contrary, it was explicitly agreed, prior to October 1, 1944, that the money the longshoremen were to be paid from day to day, or week to week, after October 1st, was not to be considered full compensation.

Appellants contend that the agreement made by Gribble, though made without express authority, was ratified by the port. The respondent replies that the port itself had no authority to make such an agreement, and invokes

the familiar rule of agency which is expressed in Restatement of the Law, Agency, p. 208, § 86, as follows:

"A transaction capable of ratification can be ratified if, *but only if,* the purported principal can authorize such a transaction at the time of affirmance, . . ." (Italics ours.)

It was this principle, we take it, that one of respondent's counsel had in mind, when, in making the opening statement at the trial, he said, that the facts would be largely admitted, and— "The question presented is one of power." As we interpret the memorandum opinion of the trial judge, he was also of that opinion. After outlining the facts, he began his decision as follows:

"It is well settled by our Supreme Court decisions that a municipal corporation such as the Port of Olympia has only such powers as are expressly granted to it by the state legislature. *State Ex Rel Port of Seattle vs Superior Court, 93 Wash. 265* [267]. Section [9692] 1943, Remington's Revised Statutes Sup. and section 9693 Remington's Revised Statutes granting authority to port districts and port commissioners contains no authority for granting retroactive relief as provided by the resolution."

It is said in respondent's brief:

"The only power granted to the Commissions of the public ports of the State of Washington is found in the following statute, the pertinent portion reading as follows (Rem. Rev. Stat., § 9693):

" ' . . . The port commission shall have authority to create and fill such positions and fix salaries and bonds thereof as it may by resolution provide. All materials required by the port district may be purchased in the open market or by contract, and all work ordered may be let by contract or done by day labor as the port commission may determine.' "

■■ Both court and counsel appear to wholly ignore the doctrine of implied powers. In the case which the court cites, in that portion of its memorandum opinion which we have above quoted, it appears that the 1915 legislature passed an act amending the original act creating port districts. The commissioners of the Port of Seattle

were so highly displeased with its provisions that they started a referendum campaign to nullify it, using the funds of the port for the purpose of advertising, lobbying, and printing circulars and scattering them throughout the state. In an action brought on the theory that the port commissioners had no power to so expend tax money, they were enjoined in the superior court from spending further funds for that purpose. In the opinion on the review of the case, this court approved the following statement of the legal principle involved:

" 'A municipal corporation is limited in its powers to those granted in express words, or to those necessarily or fairly implied in or incident to the powers expressly granted, and also to those essential to the declared objects and purposes of the corporation. 1 Dillon, Mun. Corp. (4th ed.), § 89.' "

In deciding the case, the court said:

"It is not claimed that there is any express provision authorizing the Port of Seattle to expend money as is here attempted. The powers of the corporation, as defined by the act creating it, chapter 62 of the Laws of 1913, p. 202, are general in their character. They are stated as follows:

" 'To lay out, construct, condemn, purchase, acquire, add to, maintain, conduct, and operate any and all systems of seawalls, jetties, wharves, docks, ferries, canals, locks, tidal basins and other harbor improvements, rail and water transfer and terminal facilities within such port district.' Laws 1913, p. 210, § 4 (Rem. 1915 Code, § 8165-4).

*"The port commissioners have, no doubt, implied authority to spend the money of the port for any of these purposes,* but clearly the purpose for which this money is being spent is not, and cannot be, reasonably implied from the powers named." (Italics ours.) *State ex rel. Port of Seattle v. Superior Court,* 93 Wash. 267, 160 Pac. 755.

The language which we have italicized is equivalent to an affirmative holding that, even at that early date, the public ports had authority to spend tax money in employing longshoremen. For how could they maintain, conduct, and operate any and all systems of " . . . wharves, docks, . . . rail and water transfer and terminal facilities" without doing so? Clearly, such power was, in

the language of Dillon, quoted in the opinion, "essential to the declared objects and purposes of the corporation."

(In the instant case, we are not directly concerned with the expenditure of tax money. The evidence is explicit that the longshoremen were paid out of operating earnings, that is, from funds accruing from activities carried on in a proprietary capacity.)

As we have shown by previous quotation from respondent's brief, his counsel have based their argument as to power, or at least their written argument, upon the assumption that the only power granted to the commissioners of the public ports of the state of Washington is found in the six lines which they quote from Rem. Rev. Stat., § 9693 [P.P.C. § 777-21]. The original grant of power to port districts was set out in one of the quotations hitherto made from the opinion of the court in *State ex rel. Port of Seattle v. Superior Court, supra.* This grant of power was amended in 1913, 1917, 1921, and lastly, in 1943. See Laws of 1943, p. 536, § 2, codified in Rem. Supp. 1943 as § 9692 [P.P.C. § 777-19], from which we quote the following:

"Powers of district. All port districts organized under the provisions of this act shall be and are hereby authorized . . . to lay out, construct, condemn, purchase, acquire, add to, maintain, conduct and operate any and all systems of sea walls, jetties, piers, wharves, docks, boat landings, warehouses, storehouses, elevators, grain bins, cold storage plants, terminal icing plants, bunkers, oil tanks, ferries, canals, locks, tidal basins, bridges, subways, tramways, cableways, conveyors, together with modern appliances for the economical handling, storing and transporting of freight and handling of passenger traffic, and other harbor improvements, rail and water transfer and terminal facilities within such port district; and in connection with the operation of the improvement of the port district to perform all customary services including the handling, weighing, measuring and reconditioning all commodities received; to apply to the proper authorities of the United States under any law now or which may hereafter be in force for the right to establish, operate and maintain foreign trade zones within the limits of the port district and to establish, operate and maintain such foreign trade zones: . . . "

It is true the above grant of powers gives no authority to port commissioners to grant "retroactive relief," as the trial court puts it in its memorandum opinion. Nor is the word "longshoremen" found anywhere in the port statutes. We are dealing with a very general grant of powers to a municipal corporation, but one that is not created to govern in any such sense as in the case of a county or a city, but only to engage in purely proprietary undertakings in direct competition with private corporations or individuals engaged in the same business. The wide range of difference in character between municipal corporations may be illustrated in this way: We have repeatedly held that a city fireman is a public officer. *State ex rel. Knez v. Seattle,* 176 Wash. 283, 287, 28 P. (2d) 1020, 33 P. (2d) 905. In that case, we, for the second time, reaffirmed the following statement therein quoted from *Johnson v. Pease,* 126 Wash. 163, 217 Pac. 1005:

" 'In maintaining a fire department, a city is exercising a governmental function, and a fireman, instead of being considered as an ordinary employee of the city, "is in fact a public officer and engaged in a governmental duty." ' "

We think, however, that no one will contend that a longshoreman engaged in loading or unloading a vessel— here today and gone tomorrow—is a public officer.

The respondent places much reliance upon the case of *Hailey v. King County,* 21 Wn. (2d) 53, 149 P. (2d) 823, 154 A. L. R. 351. Hailey had been, for several years prior to 1941, the "Industrial and Medical Aid Agent for King County," appropriations for his salary as such being made and paid pursuant to the provisions of Rem. Rev. Stat., §§ 3997-1 to 3997-10 [P.P.C. §§ 478-1 to 478-19],—the county budget statutes. The 1941 budget contained no appropriation whatever for that position, although, knowing this to be the case, Hailey kept on working. Ultimately, he brought suit against the county. He testified that each of the commissioners with whom he severally talked at different times led him to believe that some way would be contrived to pay him. Under his own evidence, he had no shadow of an express contract and a contract implied, in

fact, was precluded by the absence of any appropriation in the budget; nor was there anything in the circumstances that would have warranted the court in applying the fictional doctrine of quasi contract. Hailey was a mere volunteer.

Respondent also places reliance upon *Chandler v. Washington Toll Bridge Authority*, 17 Wn. (2d) 591, 137 P. (2d) 97. That this case has no relation to the matter before us may be sufficiently shown by quoting the following paragraph from the opinion in that case:

"Appellant does not rely upon any contract implied in fact. Indeed, his complaint contains no allegations which could be construed as alleging the existence of any such contract. None of his allegations warrants even an implication that appellant rendered services at respondent's request, or rendered any such services with any idea that respondent would pay him therefor. His sole contention is that the allegations of his complaint show that respondent is liable to him upon a quasi contract."

The case of *Hailey v. King County, supra*, cannot rule the decision of this case, unless we find that the port commissioners did not themselves possess the power to make such a contract as that which their manager purported to make and which they clearly ratified. Concededly, the commissioners had no express power to employ a single longshoreman. But how were they

". . . to maintain, conduct, and operate any and all systems of . . . piers, wharves, docks, . . . warehouses, storehouses, elevators, grain bins, cold storage plants, terminal icing plants, . . . with modern appliances for the economical handling, storing and transporting of freight . . . and other harbor improvements, rail and water transfer and terminal facilities within such port district; and in connection with the operation of the improvement of the port district to perform all customary services including the handling, weighing, measuring and reconditioning all commodities received, . . ."

without employing longshoremen?

It is so obvious that a public port must have the implied power to employ longshoremen, that no discussion of that point is required. Without such employees, a port

could not perform the very functions which it was created to perform. Clearly, the power to employ includes the power to contract, and, as corollary to that, since longshoremen are absolutely necessary to carry on the functions of a port, we think a port necessarily has the implied power to make such contracts relating to wages, hours, vacations, and so forth, as are customarily offered to longshoremen by its competitors in the same business. The Port of Olympia could only draw its longshoremen from the same labor pool from which the members of the association secured their longshoremen; that is, from the International Longshoremen's and Warehousemen's Union. There was no reason to suppose that, during 1944 in particular, it could procure longshoremen at a lesser scale of wages than that paid by the members of the Waterfront Employers' Association.

It is our opinion, based on facts hereinbefore stated in considerable detail, that, if the representative of the union had made the proposition, accepted by Gribble, directly to the port commissioners, the commissioners would have had the legal power to accept it. The respondent admits that, under the then conditions, it was expedient to make such an agreement as Gribble purported to make, but says that "expediency can never bring into being a power that has not been granted." But, in our opinion, the exercise of the power was more than merely expedient. It was necessary to insure the continued performance of "the declared objects and purposes of the corporation." The proposal of the authorized negotiator for the union was: Unless you agree to compensate the men in the same manner that the members of the employers' association have agreed to compensate them for work done after October 1, 1944, they will quit work on that date.

It is contended that for the port to have formally agreed to pay a wage which it was agreed, in the International-Waterfront Employers' contract, the war labor board might fix, would have been manifestly against public policy. It seems to us that such an agreement, made about midyear in 1944, would have been peculiarly consistent

with public policy, at least with the over-all and paramount public policy of the Federal Union, as exemplified by numerous congressional enactments, such as, for example, the Wagner act and the war labor disputes act.

The evidence is that, if such an agreement had not been made, the men would not have continued to work. That would have constituted a labor dispute of such character as to warrant the issuance of a certificate that a labor dispute existed which might lead to substantial interference with the war effort. This would have given the war labor board jurisdiction to summon the port and the union to a hearing on the matter, and whether the parties appeared or not, the board would have had jurisdiction

". . . to decide the dispute, and provide by order the wages and hours and all other terms and conditions (customarily included in collective-bargaining agreements) governing the relations between the parties, which shall be in effect until further order of the Board." 50 U.S.C.A. 581, § 1507, subd. 2.

This is the identical board whose findings as to the fair and reasonable wages for longshoremen on the Pacific coast the Waterfront Employers' Association contracted to accept, and, by adoption, Gribble purported to agree would be acceptable to the Port of Olympia. Had Gribble not so agreed, the result in the end would presumably have been the fixation of the same scale of wages for the Pacific coast work done after October 1st that was fixed pursuant to the association agreement. But on account of the so-called Gribble agreement, that result was reached without a labor dispute, with all its attendant evils, or the stoppage of the vital war work of the port for a single day.

We are not disposed to hold that, if that agreement had been formally made by the commissioners, it would have been void as against public policy. On the contrary, under the conditions shown, we think the agreement made by Gribble, purporting to act for the port, and subsequently ratified by the port, was not only consistent with public policy, but with good judgment and common sense.

A holding that the alleged contract was illegal would necessarily result in an affirmance of the judgment and decree from which this appeal is taken, but it would not finally dispose of the real subject matter of this dispute. There is no evidence whatever tending to prove that any contract to continue at work at the old rate came into being, and if the alleged contract, relied on in this action, was not legal, then there was no contract of employment at all. If this be the case, the longshoremen cannot be deprived of their right to file and prosecute claims for the reasonable value of the services they performed during the period involved, by any judgment or order we can make in this action, or, upon the evidence we find in this record, in any other action. Respondent's counsel, as a foundation for their contention that the constitutional prohibition of extra compensation for services previously rendered precludes any further payments, contended that the receipt of the wages actually paid after October 1, 1944, without protest of any kind, constituted payment in full.

We are indebted to *amici curiae* who, with consent of the court, filed a brief after the hearing of this appeal, for directing our attention to the case of *Martin v. Campanaro,* 156 F. (2d) 127, decided on June 5, 1946, by the United States circuit court of appeals, second circuit (writ of certiorari denied by the supreme court of the United States, 67 S. Ct. 112). The opinion in that case shows that the claims of thirty-six members of an A. F. of L. union against the assets of the Suburban Bus Company were rejected by a referee in bankruptcy, and his ruling was upheld by the district judge. The workmen had been employed for four years by a yearly collective-bargaining agreement. The agreement made in 1943 expired by its terms on May 24, 1944. Negotiations for a new agreement reached a stalemate, and the dispute was referred to the war labor board for adjustment, the men continuing to work. We quote from the factual statement upon which the decision of the circuit court is based:

"From May 24, 1944 to May 3, 1945, when the claimants were discharged, they were paid each week at the rates

fixed by the written agreement which had expired on May 24, 1944. These weekly payments were made for a time in cash and for a time by check; on each check or on the flap of each pay envelope there appeared a statement showing the time, period, amount due, rate of pay and deductions (for hospitalization, union dues, Social Security, and the like); each of the claimants signed the flaps on his pay envelopes."

On these facts, the district judge had held:

" 'The contract of the parties negatives a holding that the claimants continued working upon a quantum meruit basis.' "

In reversing the district court and ordering a hearing to determine the value of the claimant's services, the circuit court of appeals said:

"A contract implied in fact derives from the 'presumed' intention of the parties as indicated by their conduct. When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old. Ordinarily, the existence of such a new contract is determined by the 'objective' test, i. e., whether a reasonable man would think the parties intended to make such a new binding agreement—whether they acted as if they so intended.

"Applying that test, as it is applied by the New York (as well as most other) courts no new contract to continue on the old terms came into being here. In the light of the notice of April 19, 1944, from Amalgamated to Suburban, the subsequent unsuccessful negotiations, the activities of the Mediation Board, the hearings before the National War Labor Board, and the wartime no-strike pledge given by organized labor (of which we may take judicial notice), we think that a 'reasonable man' would not believe that, when these employees continued to work, while their representative, Amalgamated, was making efforts to procure revised terms, they were agreeing to work, in the interval, at the old rates. No more, on these facts, could it reasonably be supposed that their signing the pay envelopes, or their accepting the checks, was the equivalent of giving releases or waivers of their claims for additional compensation; for whether a receipt constitutes a release or waiver depends on the circumstances under

which it was given. Implications which would ordinarily stem from certain kinds of conduct are, of course, negatived by other conduct inconsistent with such implications.

"We think that here there was a contract 'implied in fact' to pay the reasonable value of the services unless a new contract definitizing the wage-rates should be negotiated, and that, in the meantime, the employees accepted, merely on account, what was paid them. Accordingly, there must be a hearing to determine the value of claimants' services."

 We may further note that it has been held in *Abrams v. Seattle,* 173 Wash. 495, 502, 23 P. (2d) 869, that a municipal corporation has the power to compromise claims, and it is said in 6 McQuillin, Municipal Corporations (2d ed.) 967, § 2755:

"But a taxpayer's suit does not lie to control or interfere with the discretion of a municipal board or officer, at least, unless there is fraud or gross abuse of the discretion."

It would seem, then, that the affirmance of the judgment and decree in this case would be of little or no advantage to the respondent, taxpayer, if the Port of Olympia should persist in its opinion that the claims of the workmen were reasonable and just, and should be paid.

 We, of course, decide nothing as to the liability of public ports other than that of the Port of Olympia. Not only are they not parties to this action, but the factual situation as to each of such ports may, as far as we know, be quite different. We hold that the Port of Olympia has the legal power to pay the asserted wage claims pursuant to the agreement made by its manager, and subsequently ratified by the port.

The judgment and decree appealed from is reversed, and the cause dismissed.

MALLERY, C. J., STEINERT, JEFFERS, SCHWELLENBACH, ABEL, and HILL, JJ., concur.

MILLARD, J. (dissenting)—In *Forseth v. Tacoma, ante* p. 284, 178 P. (2d) 357, only one person involved, we held that a municipal corporation may not be estopped to question the actions of its representatives. In the case at

bar, which involves a labor union with a large membership, we hold that the doctrine of equitable estoppel may be invoked to permit that membership to collect back pay.

SIMPSON, J. (dissenting)—I am of the opinion that port officials have no authority to issue warrants for *"retroactive* additional compensation, *retroactive* over-time compensation, or *retroactive* vacation pay." My reason is that Art. II, § 25, of the constitution of the state of Washington, which reads:

"EXTRA COMPENSATION, PROHIBITED.—The legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor after the services shall have been rendered or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office,"

means exactly what it says. The provisions of the constitution are clear and definite, and cannot be changed by the contracts of agents, by the acts of the legislature, or by judicial interpretation.