COURT OF APPEALS DIV I
2013 NOV 25 AM 9: 01



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ARTHUR LANE; JOHN ALLERTON, and KENNETH GOROHOFF, | ) ) ) | No. 69157-1-I |
| Appellants, | ) ) | DIVISION ONE |
| v. | ) ) ) | |
| PORT OF SEATTLE; KING COUNTY; BNSF RAILWAY COMPANY; GNP RLY, INC.; and CITY OF REDMOND, | ) ) ) ) ) | PUBLISHED OPINION FILED: November 25, 2013 |
| Respondents. | ) ) ) | |

BECKER, J. — The Port of Seattle purchased the Eastside Rail Corridor from Burlington Northern Santa Fe Railway Company (BNSF) for $81.4 million and sold portions to fellow respondents King County and the city of Redmond. Appellants contend the Port lacked statutory authority to make the purchase because the northern part of the corridor lies outside the port district and will not be used to run cargo to or from existing port facilities. We conclude the Port acted within its statutory powers.

In 2003, Burlington Northern announced its intention to sell the Eastside Rail Corridor, a 42-mile rail line that runs from Renton to Snohomish and includes a spur line running east to Redmond.

The main north-south line of the corridor was built in the late 1800s as a narrow, single-track line to move freight along the east side of Lake Washington. Then known as the Lake Washington Beltline, it provided freight service for nearly a century. The Redmond Spur, which began operating in the 1880s, was also built to move freight.

The southern portion of the corridor, between Renton and just south of Woodinville, is located entirely within King County, as is the Redmond Spur. The southern portion and the Spur are within the port district, the boundaries of which are coterminous with King County.

The northern portion of the corridor, running from just south of Woodinville to Snohomish, lies mostly in Snohomish County, outside the port district. At the north end, the tracks connect to the interstate rail line along which Burlington Northern transports freight to and from the Midwest over Stevens Pass. GNP Railway Inc. holds the right to transport freight from the interstate line to businesses located along the northern portion of the line between Woodinville and Snohomish. Currently, that freight traffic is intermittent and slow.

Burlington Northern decided to sell the corridor after determining that it was no longer economically viable for freight use due in part to increased maintenance costs and changing land use patterns that have brought about higher property values, causing industrial businesses to move elsewhere.

Burlington Northern offered public entities the first crack at acquiring the Eastside Rail Corridor. In 2005, King County emerged as a potential buyer. The County was interested in preserving the corridor for transportation and trail uses and did not want to see it parceled out in a way that would interfere with those uses. In 2006, the County approached the Port about joining in the purchase.

In 2009, having obtained assurances from various public entities that they would contribute toward the purchase price, the Port entered into a purchase and sale agreement to buy the northern portion and the Redmond Spur from Burlington Northern for $81,449,000. Burlington Northern agreed to donate the southern portion to the Port. Both agreements closed on December 21, 2009, as a single, interdependent transaction with each agreement conditioned on the other. The transaction was also conditioned on federal approval of "railbank" status for the portions of the corridor inside King County. On the same closing date, the County and the Port signed an interlocal agreement whereby Burlington Northern would continue using the northern portion for freight service, and the Port would place the southern portion and the Spur into "railbanked status" under the National Trails System Act, known as the "Rails to Trails Act," 16 U.S.C. §1247(d). Under the act, the railroad right-of-way can be converted to trail use as long as it remains preserved for future rail reactivation. The County agreed to assume responsibility as the interim trail user to develop and maintain the railbanked segments of the corridor.

Since the 2009 purchase, several public entities have paid the Port for parts of the corridor. Of the Port's initial outlay of $81.4 million, the sum of nearly

3

$58 million has been recouped in this manner as of the date of our appellate record. In June 2010, the city of Redmond paid $10 million to purchase 3.9 miles of the Redmond Spur for regional light rail, utility, and infrastructure improvements. In December 2010, Puget Sound Energy paid $13.8 million for a utility easement along the length of the corridor. In April 2012, Sound Transit paid $13.8 million for a transportation easement in the southern portion and the Spur, plus a fee interest in a one-mile segment in Bellevue for the East Link light rail route. That same month, the Port sold an interest in a short section of the southern portion to the city of Kirkland for $5 million. Finally, King County agreed to pay the Port $15 million to purchase the southern portion for future commuter rail use and to obtain an easement in part of the northern portion. Each of these agreements includes a provision complying with the federal railbanking statute, meaning ownership is subject to future rail use.

Plaintiffs Arthur Lane, John Allerton, and Kenneth Gorohoff filed suit in July 2010 to invalidate the purchase of the northern portion and the Redmond Spur as an unlawful expenditure of taxpayer funds. They named the Port, Burlington Northern, King County, the city of Redmond, and GNP Railway, Inc., as defendants because each entity had acquired an interest in the corridor or could be adversely affected by rescission of the $81.4 million deal. They claim the Port lacked statutory authority to purchase the corridor. However, they seek to unwind only the Port's acquisition of the northern portion and the Spur. According to their complaint, the plaintiffs wish to leave undisturbed the donated southern portion of the corridor that King County plans to develop for trail use.

In a comprehensive and well-reasoned opinion issued on December 9, 2011, the trial court granted the defendants' motions for summary judgment, dismissing the plaintiffs' claims with prejudice. This appeal followed.

As a threshold issue, the Port asserts that the plaintiffs' case is barred because it was brought as a taxpayer challenge to property taxes and the plaintiffs failed to pay their taxes under protest, which is a statutory precondition for such a suit. RCW 84.68.020; Longview Fibre Co. v. Cowlitz County, 114 Wn.2d 691, 695, 790 P.2d 149 (1990). This issue is moot. The plaintiffs dropped their initial requests for property tax refunds and now seek only declaratory relief and rescission of the purchase. The trial court did not err by hearing their challenge.

This court reviews summary judgment de novo. Tracfone Wireless, Inc. v. Dep't of Revenue, 170 Wn.2d, 273, 280-81, 242 P.3d 810 (2010). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

As a municipal corporation, a port is limited in its powers to those expressly granted, those necessarily or fairly implied in or incident to the powers expressly granted, and those essential to its declared purposes. Christie v. Port of Olympia, 27 Wn.2d 534, 545-46, 179 P.2d 294 (1947). From the earliest days of port districts in Washington, their statutory powers have included the acquisition of "rail and water transfer and terminal facilities within such districts." LAWS OF 1911, ch. 92, § 1. The Port does not rely on this early statute, as it does not attempt to characterize the corridor as a "transfer and terminal" facility.

5

Rather, the primary issue as framed by the parties is whether the necessary authority is found in RCW 53.08.290. RCW 53.08.290 codifies two separate statutes, one enacted in 1980 and one in 1981.

The construction of statutes is a question of law reviewed de novo. Whatcom County Fire Dist. No. 21 v. Whatcom County, 171 Wn.2d 421, 433, 256 P.3d 295 (2011). In determining whether a statute conveys a plain meaning, "that meaning is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). "Plain meaning 'is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010), quoting State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009).

## THE 1980 STATUTE: "IN CONNECTION WITH"

The first statute we must consider is Laws of 1980, chapter 110, entitled an act "providing for facilities by port districts for the movement of freight and passengers."

Section 2 of the 1980 act expressly authorizes a port district to acquire rail services:

> In addition to the other powers under this chapter, a port district, in connection with the operation of facilities and improvements of the district, may perform all necessary activities related to the intermodal movement of interstate and foreign cargo:

6

> PROVIDED, That nothing contained herein shall authorize a port district to engage in the transportation of commodities by motor vehicle for compensation outside the boundaries of the port district. *A port district may, by itself or in conjunction with public or private entities, acquire, construct, purchase, lease, contract for, provide, and operate rail services, equipment, and facilities:* PROVIDED, That no port district shall engage in the manufacture of rail cars for use off port property.

LAWS OF 1980, ch. 110, § 2 (emphasis added).

As the plaintiffs interpret section 2 of the 1980 statute, the authority it grants ports to acquire rail services is limited by the phrase, "in connection with the operation of facilities and improvements of the district," found in the first sentence. According to the plaintiffs, the phrase means that a port may acquire a rail corridor only for the purpose of moving cargo to and from its existing facilities, such as the facilities maintained by the Port at Elliott Bay and Sea-Tac Airport. Because the Eastside Rail Corridor has no physical connection to the harbor and the airport, the plaintiffs contend the Port's purchase of the corridor was unauthorized.

The plain language of the statute does not support their position. Section 2 consists of two sentences. Each addresses a distinct topic. The first is the extent of a port district's authority to "perform all necessary activities related to the intermodal[1] movement of interstate and foreign cargo." The second is the extent of a port district's authority to "acquire, construct, purchase, lease, contract for, provide, and operate rail services, equipment, and facilities."

---

[1] Intermodal means "involving transportation by more than one form of carrier during a single journey." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 99a (2002).

7

Section 1 of the 1980 statute states that the purpose of the statute was to clarify existing law. LAWS OF 1980, ch. 110, § 1(1). In accord with that expressed intent, it is most natural to read section 2 as the legislature's confirmation that the general powers of port districts at the time of the enactment already specifically included performing activities related to intermodal cargo movement and acquiring rail services.[2] The provisos that follow each of the two sentences qualify these powers by telling port districts two specific things they may *not* do. Ports may not transport cargo outside the district by motor vehicle for compensation, and they may not manufacture rail cars for use off of port property.[3]

---

[2] See, e.g., RCW 53.08.020, authorizing ports to construct, purchase, and operate belt line railways. LAWS OF 1961, ch. 126, § 1. Because we find the requisite authority to purchase the corridor in RCW 53.08.290 (the focal point of the parties' dispute), we do not address the Port's argument that the corridor also qualifies as a belt line railway under RCW 53.08.020.

[3] Legislative history may be of some interest even where the court concludes that the plain language of the statute is unambiguous. Scott v. Cascade Structures, 100 Wn.2d 537, 544, 673 P.2d 179 (1983). This is particularly so where the contemporaneous record of a bill's progress bolsters the plain meaning. In that vein, we set forth what the Senate and House journals disclose about the bill that eventually became Laws of 1980, chapter 110. We recognize that remarks of individual legislators in floor debate cannot be used to establish the intent of the entire legislative body. Scott, 100 Wn.2d at 544. We also recognize that legislative history may not be relied upon as an aid in discerning legislative intent unless the statute under review is susceptible to more than one reasonable meaning. Campbell & Gwinn, LLC, 146 Wn.2d at 12. We do not rely on the legislative history but simply note the plain meaning of the statute is consistent with the legislative history.

The bill began as Senate Bill 3422. The proviso forbidding the manufacture of rail cars for use off of port property was added to the bill by a Senate floor amendment. SENATE JOURNAL, 46th Leg., Reg. Sess., at 358-59 (Wash. 1980). In the course of the floor debate, the Senate rejected proposed language that would have prohibited a port from purchasing "any railroad tracks located on property not owned by the port district." SENATE JOURNAL, 46th Leg., Reg. Sess., at 358-59 (Wash. 1980). The bill passed the Senate and went to the House. The House committee reported the bill out with a recommendation to amend it by adding the proviso forbidding "transportation of

The second sentence states that, so long as a port district does not engage in the manufacturing of rail cars for use off port property, it may acquire a rail line. This plain statement would appear to support the Port's purchase of the Eastside Rail Corridor without the need for further inquiry into the meaning of the statute.

The plaintiffs, however, contend that the authority for the acquisition of rail found in the second sentence is subject to a limitation found in the first sentence. They propose to read section 2 as if the two distinct sentences were really one: "a port district, in connection with the operation of facilities and improvements of the district, may . . . acquire, construct, purchase, lease, contract for, provide, and operate rail services, equipment, and facilities." Ignoring the intervening language and proviso, they then contend that the phrase "in connection with" means that the second sentence authorizes the acquisition of a rail line only if the line links up to (is "in connection with") the harbor or the airport ("the operation of facilities and improvements of the district").

---

commodities by motor vehicle for compensation outside the boundaries of the port district." HOUSE JOURNAL, 46th Leg., Reg. Sess., at 345 (Wash. 1980). On the floor, the amendment was adopted, and the House passed the bill as amended. HOUSE JOURNAL, 46th Leg., Reg. Sess., at 441 (Wash. 1980). The Senate later concurred in the House amendment. The sponsor of the Senate bill remarked, "'They have simply added the word 'trucking' [an apparent reference to the House amendment] to the other things that they did not want the port district to get into; . . . and for the record, there is no intent in this bill that any port district shall enter into competition with any private firm that is in operation.'" SENATE JOURNAL, 46th Leg., Reg. Sess., at 632 (Wash. 1980). The Senate concurred in the House amendment and passed Engrossed Senate Bill 3422, which was eventually signed into law.

This is a strained way to read section 2 of the 1980 statute. The plaintiffs contend their reading is mandatory because the statement of legislative purpose in section 1 shows that the two topics are interrelated. But the relationship between the two topics as declared by section 1 is merely that both topics are about the movement of cargo:

> NEW SECTION. Section 1. The purpose of this act is to:
> (1) Clarify existing law as to the authority of port districts to perform certain cargo movement activities and to contract for or otherwise provide facilities for rail service for the movement of such cargo.

LAWS OF 1980, ch. 110, § 1(1). The "in connection with" language is not found in the statement of legislative intent. That language modifies only the first sentence of section 2 concerning the performance of "all necessary activities related to the intermodal movement of interstate and foreign cargo." It does not modify the second sentence concerning the power to acquire "rail services, equipment, and facilities."

We conclude that the 1980 statute conveys a plain meaning. It authorizes a port district to acquire a rail line for the movement of cargo. The 1980 act contains no requirement that the rail line acquired must have a physical connection with already existing port facilities.

## THE 1981 STATUTE:
## "EXTRATERRITORIAL RAIL SERVICES"

Statutory authority has long existed allowing a port to acquire by purchase or by condemnation "all lands, property, property rights, leases, or easements necessary for its purposes." RCW 53.08.010. Ports may construct, purchase,

10

and operate many different types of facilities, including harbor improvements, warehouses, bridges, subways, rail terminal facilities, and "belt line railways." RCW 53.08.020. But generally, a port district must exercise its powers "within the district." RCW 53.04.010; State ex rel. Keeler v. Port of Peninsula, 89 Wn.2d 764, 767-68, 575 P.2d 713 (1978).

As discussed above, section 2 of the 1980 statute authorized ports to acquire rail, but it did not specify whether or not it was permissible to acquire rail outside of port boundaries.

In 1981, the legislature amended the 1980 statute. The 1981 statute explicitly gave ports the authority to acquire rail facilities "outside the port district." But an added proviso stated that the authority could be exercised outside the port district boundaries only if the port commission adopted a resolution finding the "extraterritorial rail services, equipment or facilities" to be "reasonably necessary" to link up to an interstate railroad system:

> A port district may, by itself or in conjunction with public or private entities, acquire, construct, purchase, lease, contract for, provide, and operate rail services, equipment, and facilities inside or outside the port district:  PROVIDED, That such authority may only be exercised outside the boundaries of the port district if such extraterritorial rail services, equipment or facilities are found, by resolution of the commission of the port district exercising such authority, to be reasonably necessary to link the rail services, equipment, and facilities within the port district to an interstate railroad system; however, if such extraterritorial rail services, equipment, or facilities are in or are to be located in one or more other port districts, the commission of such other port district or districts must consent by resolution to the proposed plan of the originating port district which consent shall not be unreasonably withheld:  PROVIDED FURTHER, That no port district shall engage in the manufacture of rail cars for use off port property.

11

Laws of 1981, ch. 47, § 1 (underlined portion is language added in 1981); RCW 53.08.290.[4]

The port commission voted to move forward with the purchase of the Eastside Rail Corridor in May 2008. The purchase closed in December 2009. The plaintiffs brought suit in July 2010, alleging that the port commission had failed to comply with the statutory requirement for a formal resolution. On August 3, 2010, the port commission passed resolution 3639 to ratify its prior acts and to cure what the Port refers to as "a procedural oversight." Resolution 3639 stated that the Port's acquisition of the Snohomish County portion of the corridor was "reasonably necessary to link the rail services, equipment, and facilities within the port district to an interstate railroad system."

The plaintiffs contend the Port's acquisition is *ultra vires* because the port commission adopted the resolution of reasonable necessity after the purchase closed, not before. They analogize to Noel v. Cole, 98 Wn.2d 375, 655 P.2d 245 (1982). In Noel, the Department of Natural Resources sold timber rights to a private company without first preparing an environmental impact statement as

---

[4] The Port cites a 1981 "Final Legislative Report," which provides the following "BACKGROUND" for Laws of 1981, chapter 47:

> Port districts have general authority to operate railroad systems for the movement of interstate and foreign cargo. Several port districts had opportunities to acquire rail facilities from defunct lines but needed specific authority to operate across district boundaries.

A "Final Legislative Report," typically a compendium prepared by staff at the end of a session, is not a particularly authoritative document for purposes of discerning legislative intent, and we do not rely on it for that purpose, but merely note its consistency with our determination of the plain meaning of the 1980 statute.

required by the State Environmental Policy Act of 1971 (SEPA). Because the violation thwarted one of the central purposes of SEPA—to insure that environmental impacts are considered before a decision is made—the court declared the sale ultra vires and void. Noel, 98 Wn.2d at 380. The plaintiffs argue that similarly here, the port commission's failure to make a formal finding of necessity until after the decision to purchase the corridor "strikes at the heart of the policy behind the statute—that a port carefully consider its need for rail in a public hearing before the acquisition."

The law recognizes a distinction between government acts that are "ultra vires" and acts that suffer from "some procedural irregularity." S. Tacoma Way, LLC v. State, 169 Wn.2d 118, 122, 233 P.3d 871 (2010). "Ultra vires acts are those performed with no legal authority and are characterized as void on the basis that no power to act existed, even where proper procedural requirements are followed." S. Tacoma Way, 169 Wn.2d at 123. In S. Tacoma Way, the Department of Transportation sold some surplus property to an abutting landowner. By mistake, the Department failed to comply with a regulation requiring that a notice of intent to sell be given to all abutting landowners. One of the other abutting landowners sued to have the sale declared void. The court held that because the State was "generally authorized" to sell surplus property, the sale was not ultra vires. S. Tacoma Way, 169 Wn.2d at 123. The underlying purpose of the regulation requiring notice to other property owners was "to protect the public from governmental fraud or collusion." S. Tacoma Way, 169 Wn.2d at 124. There was no argument that fraud or collusion had occurred.

13

Thus, the violation of statutory procedures did not render the contract "automatically" illegal and unenforceable. S. Tacoma Way, 169 Wn.2d at 124.

The Court distinguished and limited the holding in Noel:

> In Noel, we emphasized the policy underlying SEPA: "'presently unquantified environmental amenities and values will be given appropriate consideration in decision making'." Noel, 98 Wn.2d at 380 (quoting RCW 43.21C.030(2)(b)). The State, in making its sale, not only failed to comply with SEPA's requirement for an EIS, it also failed to act in accordance with the policy underlying SEPA. . . . The State's failure to comply with SEPA in Noel is thus not analogous to the State's procedural error before us here.

S. Tacoma Way, 169 Wn.2d at 126.

The issue presented here calls for application of the distinction made by S. Tacoma Way. The Port was "generally authorized" to act on real estate purchases (see, e.g., RCW 53.08.010), and it also had specific authority to acquire a rail line under RCW 53.08.290. The statutory requirement for a formal resolution by the port commission is intended to ensure careful deliberation about whether a proposed acquisition of rail facilities outside the district is genuinely necessary to link up to an interstate rail system. The Port acted in accordance with that policy. The purchase was addressed numerous times in public meetings of the port commission before the deal was finalized in December 2009. For example, in November 2007, commissioners insisted that a memorandum of understanding with King County and Burlington Northern about the future purchase include the following clauses:

> (A) A critical element to the competitiveness of the Port and King County, Washington in general, as well as the region, is the velocity and capacity of facilities and infrastructure for the transfer of

14

> international cargo from ships to freight trains and its movement to the ultimate customer;
> (B) The Port desires to acquire and preserve the Woodinville Subdivision as a rail and transportation corridor.

At a December 2007 meeting in which commissioners authorized continuing negotiations with Burlington Northern, the justification for the purchase was described as preserving "a rail and transportation corridor; consistent with federal rail-banking requirements." In meetings about the purchase in 2008, commissioners returned repeatedly to the goal of preserving the rail corridor for freight and transportation uses. We conclude that the port commission fulfilled the statutory purpose of carefully considering whether the purchase was reasonably necessary to link rail services within the port district to the interstate line. Therefore, the commission's failure to adopt a formal resolution until after the transaction closed did not render the purchase ultra vires.

The plaintiffs also attack, head-on, the commission's finding of reasonable necessity in resolution 3639. They contend there is no necessity, but only a theoretical possibility, that the Port will ever use the Snohomish County segment of the corridor to move cargo from rail facilities in King County up to the interstate line across Stevens Pass.

The resolution of reasonable necessity was quasi-legislative in nature and therefore is subject to review on the merits only to determine if it is "arbitrary, capricious, or contrary to law." Dorsten v. Port of Skagit County, 32 Wn. App. 785, 788-89, 650 P.2d 220, review denied, 98 Wn.2d 1008 (1982). Such a determination generally is "'conclusive in the absence of proof of actual fraud or

15

arbitrary and capricious conduct, as would constitute constructive fraud.'" Pub. Util. Dist. No. 2 of Grant County v. N. Am. Free Trade Zone Indus., LLC, 159 Wn.2d 555, 575-76, 151 P.3d 176 (2007), quoting HTK Mgmt., LLC v. Seattle Popular Monorail Auth., 155 Wn.2d 612, 629, 121 P.3d 1166 (2005). Arbitrary and capricious refers to "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." Abbenhaus v. City of Yakima, 89 Wn.2d 855, 858-59, 576 P.2d 888 (1978); see Petition of Port of Grays Harbor, 30 Wn. App. 855, 863, 638 P.2d 633 (a port's long range plan for developing property is not arbitrary and capricious simply because a reviewing court would select a different option), review denied, 97 Wn.2d 1010 (1982).

Given the highly deferential standard of review, the plaintiffs' challenge to the resolution on reasonable necessity must fail. The Port concluded that if it did not step up to acquire the Eastside Rail Corridor, Burlington Northern would have parceled it out to various owners, eliminating the possibility of preserving the corridor for future rail service and transportation needs and thereby depriving the Puget Sound economy of a competitive advantage. The legislature has recognized that rail line abandonment threatens the economic vitality of the state:

> Since 1970, Washington has lost over one-third of its rail miles to abandonment and bankruptcies. The combination of rail abandonments and rail system capacity constraints may alter the delivery to market of many commodities. In addition, the resultant motor vehicle traffic increases the burden on state highways and

> county roads. In many cases, the cost of maintaining and upgrading the state highways and county roads exceeds the cost of maintaining rail freight service. Thus, the economy of the state will be best served by a policy of maintaining and encouraging a healthy rail freight system by creating mechanisms that keep rail freight lines operating if the benefits of the service outweigh the cost.

RCW 47.76.200. "The state, counties, local communities, ports, railroads, labor, and shippers all benefit from continuation of rail service and should participate in its preservation." RCW 47.76.240. "Local jurisdictions may implement rail service preservation projects in the absence of state participation." RCW 47.76.240(4).

Plaintiffs point to a May 2007 study in which the Puget Sound Regional Council concluded the Eastside Rail Corridor was not "a strategic regional or state freight corridor." But as the trial court noted, the undisputed evidence is that the port commissioners did not agree with the conclusions reached by the Puget Sound Regional Council. They preferred to take a longer term view of the region's transportation needs. The existence of a competing opinion about whether preserving the rail corridor will ultimately benefit the economy does not mean the Port's judgment is arbitrary and capricious.

The Port believes the northern portion of the corridor will continue to be used to deliver cargo from Burlington Northern's interstate line to businesses within King County. GNP Railway, although currently in bankruptcy proceedings, has continued such service to some north King County companies. Even if the plaintiffs are correct that this traffic is presently decreasing, it is not arbitrary for the Port to adopt the view that it is best to keep options open for the long term.

17

Among the rationales articulated by the Port is that in the event of a natural disaster that disables Burlington Northern's main line running along the west side of Seattle, the Eastside Rail Corridor will be available as a backup to move freight. The plaintiffs challenge this rationale as factually unfounded because the Regional Council's study said the corridor is incapable of transporting freight at high levels. That may be true at the present time, but part of the Port's job is to consider how to facilitate the movement of cargo in the face of earthquakes, floods, and volcano eruptions. As the trial court observed, the Port's argument that the northern portion could be used to bring supplies from the Midwest into King County in the event of a natural disaster is, by itself, sufficient to pass the "arbitrary and capricious" test. "A 'stitch in time' has never been considered capricious." City of Tacoma v. Welcker, 65 Wn.2d 677, 685-86, 399 P.2d 330 (1965) (city's decision to acquire land next to river to protect against possible contamination of water supply was not arbitrary and capricious even though no present threat existed). It is not for this court to weigh the wisdom of the Port's "stitch in time" rationale for the purchase. The ballot box is the appropriate mechanism for deciding whether the Port has exercised poor judgment by spending taxpayer dollars to preserve a rail connection through Snohomish County rather than to undertake projects more traditional and immediate.

The plaintiffs believe the true motive for the purchase was to facilitate recreational trails, not the movement of cargo. Citing various comments by the port commissioners, the plaintiffs contend that the economic and emergency

18

rationales for labeling the purchase "necessary" were identified only after the filing of the lawsuit forced the adoption of resolution 3639, and that in adopting that resolution, the commission was merely giving lip service to the statutory requirement of reasonable necessity. "The Port acquired the Corridor because it had access to taxpayer money that it chose to use to help cash-strapped King County construct its 'granddaddy of all trails.' Saying otherwise, just to win a lawsuit, amounts to constructive fraud."[5]

This again is a political argument, not a legal one. The record does not contain evidence of actual or constructive fraud. The deliberations and comments of the port commissioners were open and aboveboard. Whatever other beneficial attributes the port commissioners may have seen in the purchase, it is not dishonest to say that the extraterritorial portion of the corridor is "reasonably necessary" to link the eastside rail lines within King County to the interstate track across Stevens Pass. "Necessary" in the context of a port district's purchase of land under RCW 53.08.010 "'does not mean absolute, or indispensable, or immediate need, but rather its meaning is interwoven with the concept of public use . . . and embraces the right of the public to expect and demand the service and facilities to be provided by a proposed acquisition or improvement.'" Asotin County Port Dist. v. Clarkston Cmty. Corp., 73 Wn.2d 72, 75, 436 P.2d 470 (1968), quoting Welcker, 65 Wn.2d at 684. We conclude "necessary" has the same meaning in RCW 53.08.290. As the trial court noted,

---

[5] Appellant's Brief at 48.

19

there is "no dispute" that the only way to connect the in-district rail lines to Burlington Northern's interstate railroad system is via the northern segment of the corridor lying within Snohomish County. The Port's resolution on reasonable necessity is not subject to judicial second-guessing. It must be treated as a conclusive determination of reasonable necessity.

## RCW 53.08.010
## ACQUISITION OF PROPERTY "NECESSARY FOR ITS PURPOSES"

We must look to a different statute to find authority for the acquisition of the Redmond Spur, which lies entirely within the port district. As the trial court concluded, the spur portion of the purchase cannot be justified under RCW 53.08.290 because, given the current and planned uses for the Spur, it is undisputed that the purchase is unrelated to the movement of cargo. The trial court ruled, "It is clear that the Port purchased the Redmond Spur with the intent to sell a portion of it to the City of Redmond for its economic and infrastructure development and to sell a portion to Sound Transit for use as a part of a commuter rail system."

The trial court found the purchase was justified under RCW 53.08.010. This statute authorizes a port district to acquire any land or property within its boundaries that it deems "necessary for its purposes," including land for which the Port may have no identified plan. State ex. rel. Gorton v. Port of Walla Walla, 81 Wn.2d 872, 877, 505 P.2d 796 (1973). One of the statutorily approved purposes of port districts is economic development. "It shall be in the public

20

purpose for all port districts to engage in economic development programs." RCW 53.08.245(1).

Plaintiffs contend that the phrase "necessary for its purposes" in RCW 53.08.010 is not specific enough to authorize the purchase of a rail line. They point out that RCW 53.08.010 was on the books in 1917 when the Supreme Court held that the Seattle port commissioners lacked power to build and operate a railway as a common carrier. See State ex rel. Huggins v. Bridges, 97 Wash. 553, 166 P. 780 (1917). After Huggins, the legislature adopted statutes authorizing ports to become involved with rail under specified circumstances, such as RCW 53.08.290 (discussed above) and RCW 53.08.020 (authorizing the purchase and operation of belt line railways). Plaintiffs argue that because there is no statute specifically allowing acquisition of a rail line to serve the purpose of economic development, the purchase of the Redmond Spur must be held invalid.

Huggins does not bear the weight appellants would place on it. Huggins was decided shortly after the legislature first authorized the establishment of port districts in 1911. The initial enabling statute authorized the development of "a system of harbor improvements and rail and water transfer and terminal facilities within such districts." LAWS OF 1911, ch. 92, § 1. The Seattle port district had resolved to "run an independent switching belt railway line of its own" as a common carrier and fund it with various nonbond revenues, a proposal that engendered controversy in part because the Port had twice tried and failed to get voter approval to bond the project. Huggins, 97 Wash. at 554-56. The Supreme Court determined that the statute did not authorize the Port to acquire a rail line

21

and operate as a common carrier. The reference to "rail and water transfer and terminal facilities" signified "the idea of transshipment from rail carrier to water carrier and vice versa." Huggins, 97 Wash. at 558. That might include, for example, "a connecting track between two docks or piers or warehouses of the port commission," Huggins, 97 Wash. at 559, but it most certainly did not include a track outside the terminal to serve the public generally as a common carrier.

In the years since Huggins, the statutory powers of port districts have grown. Notably, port districts now are permitted to acquire land for the purpose of promoting economic development under RCW 53.08.245. Because economic development is a recognized purpose, the trial court correctly ruled that acquisition of the Redmond Spur for economic development is justified under RCW 53.08.010.

Plaintiffs argue that a port's involvement with economic development is limited to programs for job training and placement under RCW 53.08.245(2)(a). This argument has no merit. The section plaintiffs cite was enacted in 2010, after the purchase of the Eastside Rail Corridor, as an amendment to RCW 53.08.245. And the supposed limiting language is simply permissive; it states that economic development programs "may include" job training and placement. The intent of the statute is not to limit a port's activities to job training and placement but rather to resolve any doubt that the term "economic development" is broad enough to include job training and placement.

The plaintiffs scoff at the idea that purchase of the Redmond Spur will promote economic development. They argue that the only way it can stimulate

22

commerce and create jobs is if "bicyclists riding on the Spur trail would stop to buy ice cream, bottled water, or a new inner tube to repair a flat."[6] But actually, the record contains impressive documentation of what preservation of the Spur will mean to the city of Redmond, the center of a rapidly growing and urbanizing area. Redmond already has invested heavily in plans to redevelop the Spur to add pedestrian, transit, and business connections, and to unite the two parts of the city that presently are severed by the tracks. Planned uses of the spur corridor include new and better connected infrastructure for transportation and utilities. For example, Redmond anticipates building a stormwater trunk line within the spur right-of-way to enable property owners in the downtown core to use all of their land for commercial and residential development instead of having to reserve large portions of it for stormwater detention. And Redmond's planning also demonstrates that bicycle trails add economic value as well as recreational value.

We agree with the trial court's conclusion about the Redmond Spur: "Given the record before the Court, it was reasonable for the port commissioners to conclude that purchasing the Redmond Spur would advance trade and commerce, promote industrial growth and stimulate economic development, and was thus 'necessary for its purposes' under RCW 53.08.010."

---

[6] Appellant's Brief at 28.

In summary, the Port acted within the authority provided by statute when it acquired the Eastside Rail Corridor. The trial court properly dismissed the claims of the plaintiffs on summary judgment.

Affirmed.

Becker, J.

WE CONCUR: